STATE OF NORTH DAKOTA *ex rel.* LOUIS W. STOESER, Plaintiff and Respondent, *v.* NORMAM BRASS, Defendant and Appellant.

**Constitutional Law—Warehouse Charges—Powers of Legislature—Review on Appeal.**

> Chapter 126 of the Session Laws of 1891 considered, and §§ 4 and 11 thereof *held* to be constitutional, in so far as they define public warehouses, and in so far as they prescribe maximum rates of charges for elevating and storing grain in the puplic warehouses, as they are defined in § 4 of the act. Munn v. Illinois, 69 Ill. 99, 94 U. S. 113; People v. Budd, 22 N. E. Rep. 670, 682, 117 N. Y. 1; Budd v. People, 12 Sup. Ct. Rep. 468—followed. *Held, further,* that the record does not raise the question of the adequacy of the rate of charges fixed by § 11 of the act, and hence the case is not one which calls for a decision of the point whether the court would in any case assume to review a rate of charges established by the legislature, where it was shown that such rate was ruinously small or noncompensatory.

(Opinion filed April 25, 1892.)

*A*PPEAL from district court, Ramsey county; Hon. D. E. MORGAN, Judge.

*J. F. McGee* for appellant. *James F. O'Brien,* for respondent.

Proceedings in *mandamus* by Louis W. Stoeser against Norman Brass to compel him to receive into his elevator grain belonging to relator. From an order sustaining a demurrer to defendant's answer, and directing a peremptory writ to issue, he appeals. Affirmed.

J. F. McGee, for appellant:

The mere fact that the legislature has enacted a statute which operates to deprive appellant of his liberty and property, does not constitute "due process of law." Within every theoretical definition of the constitutional guarantees that may be found in the text books and every practical application of those guarantees that may be found in the reports, appellant has been deprived of his liberty and property without "due process of law." Wilkinson v. Leland, 2 Pet. 657; Fletcher v. Peck, 6 Cranch 137; Bank v. Okely, 4 Wheat. 235; Murry v. Hoboken, 18 How. 320; Cummings v. Missouri, 4 Wall. 277, 320; Yates v. Milwaukee, 10 Wall. 497; Pumpelly v. Green Bay Co., 13 Wall. 166; Bartemeyer v. Iowa, 18 Wall. 129; Pennoyer v. Neff, 95 U. S. 714; Davidson v. New Orleans, 96 U. S. 97; Hurtado v. California, 110 U. S. 516; Butchers' Union Co. v. Crescent City Co., 111 U. S. 652; Hagar v. Reclamation District, 111 U. S. 701; Barbier v. Connolly, 113 U. S. 37; Yick Wo v. Hopkins, 118 U. S. 356; Dent v. West Virginia, 129 U. S. 114; Railroad Co. v. Minnesota, 134 U. S. 418; Railroad Co. v. Minnesota, 134 U. S. 467; Railroad Tax Cases, 13 Fed. Rep. 722; Santa Clara Tax Cases, 18 Fed. Rep. 398; State v. Walruff, 26 Fed. Rep. 178; Railroad Co. v. Dey, 35 Fed. Rep. 866; Railroad Co. v. Becker, 35 Fed. Rep. 883; Dorman v. State, 34 Ala. 216; Sadler v. Langham, 34 Ala. 311; Stoudenmire v. Brown, 48 Ala. 699; Zeigler v. Railroad Co., 58 Ala. 594; Railroad Co. v. Baldwin, 85 Ala. 619; Stevens v. Wood, 2 Ark. 291; *Ex parte* Hodges, 87 Cal. 162; Tift v. Griffin, 5 Ga. 185; Lane v. Dorman, 3 Scammon (Ill.) 238; Railroad Co. v. People, 67 Ill. 11; Railroad Co. v. Lackey, 78 Ill. 55; Millett v. People, 117 Ill. 294; Board of Education v. Bakewell, 122 Ill. 339; Beebe v. State, 6 Ind. 501; Searcy v. Patriot, 79 Ind. 274; Towle v. Mann, 53 Iowa 42; Craig v. Fowler, 59 Iowa 200; Sunberg v. Babcock, 61 Iowa 601; Maish v. Littleton, 62 Iowa 105; Commonwealth v. Bacon, 13 Bush. 210; Varden v. Mount, 78 Ky. 86; City of Louisville v. Cochran, 82 Ky. 15; Saco v. Wentworth, 37 Me. 171; State v. Doherty, 60 Me. 504; Eames v. Savage, 77 Me. 212; Baltimore v. Rodeck, 49 Md. 217; *In re* Picquet, 5 Pick. 65; Jones v. Robbins, 8 Gray 329; Denny v. Mattoon, 2 Allen 361; Welch v. Stow-

ell, 2 Doug. (Mich.) 331; Hibbard v. People, 4 Mich. 125; Sears v. Cottrell, 5 Mich. 251; Parsons v. Russell, 11 Mich. 113; Hart v. Henderson, 17 Mich. 218; Weimer v. Bunburg, 30 Mich. 201; Detroit v. Detroit; 43 Mich. 140; People v. Common Council, 70 Mich. 534; Park v. Free Press, 72 Mich. 560; Board of Health v. Van Hoesen, 49 N. W. Rep. 894; State v. Board of Medical Examiners, 34 Minn. 387; Meyer v. Berlandi, 39 Minn. 438; Bank v. Chambers, 8 Smedes & M. (Miss.) 9; Smith v. Smith, 1 How. 102; Griffin v. Mixon, 38 Miss. 424; Quintini v. Board of Aldermen, 64 Miss. 483; Lowry v. Rainwater, 70 Mo. 152; River Rendering Co. v. Behr, 77 Mo. 91; Railroad Co. v. Baty, 6 Neb. 37; Wilch v. Phelps, 14 Neb. 134; Mayo v. Wilson, 1 N. H. 53; Aldrich v. Wright, 53 N. H. 398; Coster v. Tidewater Co., 3 Green (N. J.) 521; Powers v. Bergen, 6 N. Y. 358; Westerfelt v. Gregg, 12 N. Y. 209; Wynehamer v. People, 13 N. Y. 393; Matter of Empire City Bank, 18 N. Y. 200; Rockwell v. Nearing, 35 N. Y. 302; Matter of Townsend, 39 N. Y. 171; Underwood v. Green, 42 N. Y. 140; People v. Haines, 49 N. Y. 587; Weismar v. Village of Douglass, 64 N. Y. 91; Matter of Deansville Cemetery Association, 66 N. Y. 564; Matter of Rhinelander, 68 N. Y. 105; People v. Supervisors, 70 N. Y. 228; Matter of Ryers, 72 N. Y. 1; Stuart v. Palmer, 74 N. Y. 183; Bertholf v. O'Reilly, 74 N. Y. 515; Matter of Cheesebrough, 78 N. Y. 232; People v. Otis, 90 N. Y. 48; Matter of E. B. etc. Co., 96 N. Y. 442; Matter of Jacobs, 98 N. Y. 98; People v. Marx, 99 N. Y. 377: People v. Gillison, 109 N. Y. 389; People v. Budd, 117 N. Y. 1; Taylor v. Porter, 4 Hill 140; White v. White, 5 Barb. 474; Wright v. Cradlebaugh, 3 Nev. 341; Hoke v. Henderson, 4 Dev. (N. C.) 15; State v. Devine, 98 N. C. 778; Norman v. Heist, 5 W. & S. (Pa.) 193; Brown v. Hummel, 6 Pa. St. 86; Ervine's Appeal, 16 Pa. St. 256; Pelairet's Appeal, 67 Pa. St. 479; Railroad Co. v. Boudrou, 92 Pa. St. 475; Godcharles v. Wigeman, 113 Pa. St. 431; State v. Simons, 2 Spear (S. C.) 767; Bowman v. Middleton, 1 Bay (S. C.) 252; Van Zant v. Waddell, 2 Yerg. (Tenn.) 260; Bank v. Cooper, 2 Yerg. 523; Wallys Heirs v. Kennedy, 2 Yerg. 554; Jones v. Perry, 10 Yerg. 59; Budd v. State, 3 Humph. (Tenn.) 192; State v. Staten, 6 Coldw. (Tenn.) 233; Janes v. Reynolds, 2 Texas 251; Grigsby v. Peak, 57 Texas

142; Thorpe v. Railroad Co., 27 Vt. 1; Lincoln v. Smith, 27 Vt. 355; State v. Gilmore, 10 S. E. Rep. 283; State v. Goodwill, 10 S. E. Rep. 285; State v. Fire Creek Co., 10 S. E. Rep. 288; Osborn v. Hart, 27 Wis. 219; Durkee v. City of Janesville, 28 Wis. 464; Culbertson v. Coleman, 47 Wis. 193.

James F. O'Brien, for respondent:

Appellant having based his refusal to comply with the writ upon the unconstitutionality of the law in question, it becomes his duty to prove it beyond all doubt. Railroad Co. v. Riblet, 66 Pa. St. 164; Territory v. Van Gaskin, 6 Pac. Rep. 30; Lunt's Case, 6 Me. 413. Every presumption is in favor of the constitutionality of legislative acts. People v. Gilson, 109 N. Y. 389; St. Louis County v. Griswold, 58 Mo. 192; State v. Able, 65 Mo. 357. Appellant has no absolute right to the property in question. He holds the same subject to the paramount right of the people to control the same for the public good. Beer Co. v. Massachusetts, 97 U. S. 25; State v. Addington, 12 Mo. App. 214; Bertholf v. O'Reilly, 74 N. Y. 509. See also the leading cases of Munn, Budd and Nash.

The opinion of the court was delivered by

WALLIN, J. The statute under which this proceeding was instituted constitutes chapter 126 of the Session Laws of North Dakota for the year 1891. It is entitled "An act to regulate grain warehouses, and the weighing and handling of grain, and defining the duties of the railroad commissioners in relation thereto." The act contains fourteen sections, but we deem it unnecessary for the purposes of this case to do more than to refer to the statute, and then quote §§ 4 and 11 in full. Section 4 is as follows: "All buildings, warehouses, or elevators in this state, erected or operated, or which may be hereafter erected and operated, by any person or persons, association, co-partnership, corporation, or trust, for the purpose of buying, selling, storing, shipping, or handling grain for profit, are hereby declared public warehouses; and the person or persons, association, co-partnership, or trust owning or operating said building or buildings, elevator or elevators, warehouse or warehouses, which are now or

may hereafter be located or doing business within this state, as above described, whether said owners or operators reside within this state or not, are public warehousemen, within the meaning of this act, and none of the provisions of this act shall be construed so as to permit discrimination with reference to the buying, receiving, and handling of grain of standard grades, or in regard to parties offering such grain for sale, storage, or handling at such public warehouses, while the same are in operation." Section 11 is as follows: "The charges for storage and hauling [handling] grain shall not be greater than the following schedule: For receiving, elevating, insuring, delivering, and twenty days' storage, two (2) cents per bushel. Storage rates after the first twenty days, one-half ($\frac{1}{2}$) cent for each fifteen days or fraction thereof, and shall not exceed five (5) cents for six months. The grain shall be kept insured at the expense of the warehousemen for the benefit of the owner." Section 12 provides the penalty for violating the act by declaring that all persons "who shall violate the provisions of any section of this act, or shall do or perform any act or thing therein forbidden, or who shall fail to do or keep the requirements as herein provided, shall be deemed guilty of a misdemeanor, and shall, on conviction thereof, be subjected to a fine of not less than two hundred (200) dollars, nor more than $1,000, and be liable, in addition thereto, to imprisonment for not more than one year at the state penitentiary, at the discretion of the court." Section 5 of the act requires "public warehousemen," as defined in the statute, to file a bond with the railroad commissioners for the faithful performance of their duties as public warehousemen.

On petition of the relator the district court granted an alternative writ of *mandamus*, as follows: "The state of North Dakota to Norman Brass, respondent: Whereas, the following facts have been made to appear to this court by the verified petition of the above-named relator, to-wit: (1) That he is the relator in the above-entitled matter; that he owns and operates a farm containing 540 acres in the vicinity of the railroad station of Grand Harbor, in the county and state aforesaid, and during the year 1891 has raised on said farm about 4,000 bushels of grain, principally wheat. (2) That the relator has not sufficient

storage capacity on his farm or elsewhere for said grain so raised as aforesaid, but is dependent almost wholly upon the grain elevators and warehouses in the vicinity of said farm for storage capacity. (3) That fully fifty per cent. of the grain raised in said Ramsey county, North Dakota, is dependent for storage capacity upon the grain elevators and warehouses at the various towns, villages, and railroad stations in said Ramsey county. (4) That the respondent, Norman Brass, is now and at all the times herein stated has owned and operated a grain elevator at the station of Grand Harbor, aforesaid, for the purpose of buying, selling, storing, and shipping grain for profit. (5) That the relator on the 30th day of September, 1891, hauled fifty-eight bushels of wheat to the grain elevator of respondent, Norman Brass, at Grand Harbor, aforesaid, and tendered the same at said elevator of said Norman Brass for storage, and requested said Norman Brass to receive, elevate, insure, and store said grain for twenty days, and at the time tendered to said Brass two cents per bushel for compensation for receiving, elevating, insuring and storing said grain for twenty days; that said grain, when so tendered as aforesaid, was dry, and in a suitable condition for storage, and there was in said grain elevator of said Brass at Grand Harbor aforesaid at said time storage capacity for over 25,000 bushels of grain, not in use and wholly unoccupied. (6) That said Brass then and there refused to receive said grain for the purpose aforesaid, and wholly refused to store said grain at said price. (7) That the relator endeavored to secure storage for said grain at the only other elevator in operation at said railroad station of Grand Harbor aforesaid, but said elevator refused to receive relator's grain upon the same ground as respondent. (8) That the relator is informed and believes that the owners of grain elevators and warehouses within a radius of fifty miles of Grand Harbor, aforesaid, refuse to receive grain for storage at said price. Now, therefore, this court, in order that justice may be done in this behalf to him, Louis W. Stoeser, relator, does hereby command and enjoin you that immediately upon receipt of this writ you do receive from relator, while your storage capacity at your elevator herein mentioned is sufficient for that purpose, all grain that may be ten-

dered you by the relator, in a dry and suitable condition for
storage, at a rate of compensation not exceeding the following
schedule, viz., for receiving, elevating, insuring, delivering, and
twenty days' storage, two cents per bushel; storage rates after
the first twenty days, one half cent per bushel for each fifteen
days or fraction thereof, and shall not exceed five cents for six
months; or that you show cause to the contrary before this court,
at the courthouse in the city of Devil's Lake, Ramsey county,
N. D., on the 5th day of October, 1891, at 10 o'clock in the fore-
noon of said day, or as soon thereafter as counsel can be heard,
and how you have executed this writ make known to this court
at the time and place aforesaid, and have you then and there
this writ. Dated Sept. 30th, 1891. D. E. MORGAN, Judge Dis-
trict Court, Ramsey County, North Dakota."

To which writ appellant made return by answer, as follows:
"The return of the respondent to the alternative writ of *man-
damus* issued in the above-entitled proceeding shows to the
court: (1) That the respondent admits the truth of the facts
pleaded in said alternative writ. (2) For a further return to the
said alternative writ the respondent alleges that he owns and
operates only one grain elevator in North Dakota or elsewhere;
that the said elevator is the elevator mentioned in said alterna-
tive writ, and is situated at Grand Harbor, a small way station
on the line of the Great Northern Railroad, containing a popu-
lation of less than one hundred people; that there are two other
elevators owned and operated by different owners independently
of and in competition with each other; that there are about six
hundred grain elevators, flathouses, and warehouses in said
state of North Dakota, at which grain is bought and shipped
for profit, which said elevators, warehouses, and flathouses are
owned and operated by over one hundred and twenty-five differ-
ent owners, independent of and in competition with each other;
that the owners of said elevators, warehouses, and flathouses are
individuals engaged in buying and shipping grain, millers who
use their elevators to supply their mills with grain, farmers'
shipping associations, elevator corporations, and individual
farmers; that said elevators, flathouses, and warehouses vary
in cost of construction from five hundred dollars to five thou-

sand dollars, and vary in capacity from five thousand to fifty
thousand bushels; that there are from two to ten elevators,
warehouses, and flathouses operated and owned, each by differ-
ent owners and operators, at every station in North Dakota at
which grain is marketed; that land upon which it is practicable
to erect other elevators at every station in North Dakota at
which grain is marketed is unlimited in area, and can be readily
purchased at prices varying from one dollar and twenty-five
cents per acre to forty dollars per acre; that respondent's said
elevator cost, when constructed and fully equipped, about three
thousand dollars; that the capacity of the same is about 30,000
bushels; that respondent's principal business is that of buying
wheat at Grand Harbor, N. D., and shipping the same to and
selling it at Minneapolis and Duluth, Minn., to which business
that of storing grain for third persons has been a mere inci-
dent; that all grain purchased by respondent at his said
elevator is purchased for the sole purpose of being shipped
to and sold at, and is shipped to and sold at Minneapo-
lis and Duluth, Minn.; that respondent in the conduct of his
said business contracts with millers and other purchasers of
grain at said Minneapolis and Duluth to sell and deliver to
said persons at a future and fixed date certain quantities of
wheat, and operates and maintains his said elevator for the ex-
clusive purpose of purchasing grain to fill said contract; that
in seasons when the grain yield is light, and railroad facilities
are such as to enable grain to be moved rapidly, there is space
and storage capacity in respondent's elevator in excess of that
used by respondent's grain, and particularly when respondent's
contracts for the sale of grain are small, while at other times,
when the yield is enormous, as in the present year, respondent's
contracts are large, and the quantities of grain presented for
shipment are beyond the capacity of the railroads to move, then
there is not sufficient storage capacity in respondent's elevator
to hold and store the grain purchased by respondent in the
conduct of his said business; that there are located in Minne-
apolis and Duluth, Minn., a great number of corporations, per-
sons, and co-partnerships engaged in a business known as the
'grain commission' business; that these grain commission

houses have swarms of agents traveling throughout the state
of North Dakota, going from town to town and farm to farm,
purchasing grain from farmers in some instances, and in others
soliciting farmers to ship their grain to said houses at Minne-
apolis or Duluth, Minn., to be by the latter sold on commission;
that none of said grain commission houses have or own any
storage capacity in North Dakota; that if chapter 126 of the
Laws of 1891 is valid, and its effect is to compel respondent to
receive all grain that may be tendered to him for storage by
grain commission men, farmers, grain speculators, and others,
without reference to the necessities or condition of respondent's
business, at any particular time, the entire storage capacity of
respondent's elevator will be exhausted in storing grain for third
persons, and the principal business of respondent, to conduct
which his capital was invested in said elevator, will be utterly
ruined and annihilated, for want of storage capacity to contain
wheat purchased by him to fill contracts made by him in the
conduct of his said business, and respondent subjected to suits
for damages for nonfulfillment of his said contracts; that the
relator only offered to pay respondent, for the service which he
requested him to perform, the rate fixed by chapter 126 of the
Laws of 1891, that is, two cents per bushel; that respondent
refused to perform the service for less than two and one-half
cents per bushel; that respondent refuses to comply with the
provisions of said chapter 126 on the ground that it abridges
his privileges and immunities as a citizen of the United States;
that it deprives him of his liberty and property without due
process of law, and denies to him the equal protection of the
laws, and amounts to a regulation of commerce among the
states; that for thirteen years last past the rate charged for the
storage of grain has been uniform at all elevators, flathouses,
and warehouses in North Dakota, and during that time did not
exceed the following schedule: For receiving, elevating, insur-
ing, delivering, and fifteen days' storage, two and one-half cents
per bushel; after the first fifteen days, one-half cent per bushel
for each fifteen days or part thereof, but not to exceed five cents
per bushel for six months; that the average farm in North Da-
kota does not exceed in area 160 acres; that the average yield

in grain of a quarter section of land in North Dakota does not exceed twenty-five hundred bushels; that a granary sufficient in size to safely and securely store twenty-five hundred bushels of grain can be erected on any farm in North Dakota at a cost not exceeding one hundred and fifty dollars; that the business of respondent and all other persons, firms, and corporations engaged in the business of operating grain elevators, warehouses, and flathouses in North Dakota, and the manner in which said business is conducted, are not in any manner unwholesome or deleterious to the health, morals, welfare, or safety of the community or society; that the railroad and warehouse commissioners of North Dakota, on page 33 of their Annual Report to the Governor for 1890, said: 'In view of the fact that, after thorough investigation, the board deem the charges allowed by § 22, c. 187, Laws 1890, and also § 10 of said chapter, as unreasonable, the following rules of storage are recommended: (1) For receiving, elevating, insuring, delivering, and fifteen days' storage, two and one-half cents per bushel. (2) After fifteen days, one-half cent per bushel for each fifteen days or part thereof, but not to exceed five cents for six months.' That the rates referred to by said commissioners as unreasonable were less than the rate recommended by said board; that the respondent denies that the legislature has any power whatever to say whether he shall rent the bins in his elevator or not, and wholly denies the power of the legislature to say what he shall charge for the use of his said elevator, or the bins therein; that since the enactment of § 9 of chapter 126 of the Laws of 1885, the amount of grain shipped directly by farmers, without the intervention of elevators, warehouses, or flathouses, has been increasing, and in 1890, as respondent is informed and believes, nearly fifty per cent. of the entire grain product of North Dakota was shipped to Minneapolis and Duluth, Minn., by farmers; that the amount of grain shipped in that manner is steadily increasing from year to year; that pursuant to § 7, chapter 122, Laws 1890, the railroad commissioners adopted and published the following rules to govern the distribution of cars and other freight, which rules are now in operation in said state of North Dakota, to-wit: 'State of North Dakota. Office of commission-

ers of railroads. Rules for the distribution of cars between stations and shippers. (1) In distributing cars to stations for grain loading, they shall be distributed according to the daily average shipments from such stations. (2) In distributing cars to shippers for grain loading at stations, agents shall first fill each shipper's order for one car to each. After this is done, the balance of the cars shall be distributed among shippers according to the amount of grain in sight offered for shipment by each shipper. (3) Parties desiring to load grain on track shall be furnished cars, and shall be allowed, for loading time, twenty-four hours from the time the car is set on the side track to complete loading and furnish shipping directions. In case shipper fails to complete loading or furnish shipping directions within twenty-four hours, then, in such case, the railway company may collect upon such cars $3 rental for each and every day or part of a day which such cars are delayed after twenty-four hours. The above rule as to time and rental charges shall also apply to grain delayed in unloading on track.' In connection with said rules in said report, said commissioners said: 'We believe that the railroads have labored faithfully to supply cars to shippers, in accordance with these rules, and, so far as their ability to supply the demand permitted, cars have been distributed in conformity therewith. From September 15th to December 15th the demand for cars is double the ability of the roads to supply, and as a necessary consequence delay in supplying cars must ensue. In all cases of complaint as to failure to get cars investigated this year, this has been the case, and cars have been supplied as soon as possible by the railroad companies. The liberal policy of the railroads in the distribution of cars adopted this year has been of great benefit to the farmers of North Dakota.' Wherefore respondent demands judgment quashing the alternative writ of *mandamus*, dismissing this proceeding, and for his costs and disbursements laid out and expended in this action. Dated this 5th day of October, 1891. JOHN W. MAHER, Attorney for Respondent."

The relator interposed a general demurrer for insufficiency to the answer, and, after a hearing upon the issue of law raised by the demurrer, the district court ruled that the demurrer be

sustained.    The appellant having made his election to stand upon the answer, the trial court ordered and adjudged that the peremptory writ be issued as prayed for, and from this order an appeal is taken to this court.    The principal assignments of error are as follows:    "(1) That the court erred in sustaining the relator's demurrer to the appellant's answer and return; (2) that the court erred in holding chapter 126 of the Laws of 1891, and particularly § 11 of that chapter, constitutional."

The grain elevator and warehouse in question, as described in the alternative writ as well as in the answer thereto, is confessedly a building which falls within the statutory definition of "public warehouses;" and the appellant, as sole owner and manager of the elevator and of the grain business carried on within it, at the inception of this proceeding and long prior thereto, was clearly a "public warehouseman," within the terms and meaning of the statute.    The answer admits and alleges that "respondent's [appellant's] principal business is that of buying wheat at Grand Harbor, North Dakota, and shipping the same to and selling it at Minneapolis and Duluth, Minn., to which business that of storing grain for third persons is and always has been a mere incident."    From this it appears that appellant's warehouse, as well as his grain business, is essentially within the terms and definitions of the act in question. See § 4, c. 126, above quoted.    The answer in terms admits all matters of fact set out in the alternative writ, and the demurrer to the answer admits all facts which are well pleaded in the answer to the writ.    Hence any averments of mere fact which are embodied in both the writ and the answer are admitted of record to be true as pleaded.    It appears that the object of the proceeding is to compel the appellant, as a public warehouseman, to store the relator's grain in appellant's warehouse and grain elevator at the rate of compensation fixed by § 11 of the statute.    This appellant refused to do on demand and tender of the prescribed rate of compensation.    Appellant's refusal to receive the grain into his warehouse is not based upon any alleged inadequacy of the statutory rate, but was placed solely upon the ground that he was unwilling to lower his charges for storage below the sum he had been receiving in prior years for the

same service. Appellant had empty space in his warehouse which was available, and he was willing as a matter of business to receive and store the grain, but was unwilling to reduce his charges under legislative dictation. Appellant denies the validity of chapter 126, and especially § 11 thereof, and bases his defense wholly upon constitutional grounds; claiming that the statute is invalid because it deprives him of the free, untrammeled use of his property without due process of law, and deprives him of the equal protection of the law, as these fundamental rights are guarded against legislative encroachment by the constitution of the state and of the United States—citing § 13 of the constitution of this state, and § 1 of the fourteenth amendment of the constitution of the United States, in support of his contention. Appellant has purposely limited his defense to the one question of legislative power to regulate his warehouse business by prescribing rates. Nothing is alleged or claimed in argument tending to show that the prescribed rate would be noncompensatory; much less that it would operate practically to confiscate relator's business as a warehouseman and grain dealer. It distinctly appears, moreover, that when relator tendered his grain for storage, not only that appellant owned and operated a grain elevator situated at the railroad station in question, but further appeared "that said grain when so tendered, as aforesaid, was dry and in a suitable condition for storage, and there was in said grain elevator   *   *   *   at said time storage capacity for over twenty-five thousand bushels of grain, not in use and wholly unoccupied." The answer to the writ states the entire scope of appellant's contention in the paragraphs quoted below: "The respondent [appellant] refuses to comply with the provisions of said chapter 126, on the ground that it abridges his privileges and immunities as a citizen of the United States; that it deprives him of his liberty and property without due process of law, and denies to him the equal protection of the laws, and amounts to a regulation of commerce among the states;" "that the respondent denies that the legislature has any power whatever to say whether he shall rent the bins in his elevator or not; and wholly denies the power of the legislature to say what he shall charge for the use of his said elevator or the bins therein."

In further explanation of the particular points of this contention, it should be noticed that at the argument appellant's counsel was careful to limit the discussion to the one question of legislative power to enact the statute, and particularly § 11 thereof which prescribes a maximum schedule of rates for the storage, of grain in public warehouses. Counsel did not claim, in argument or otherwise, that at the time in question the appellant was not engaged in the business of storing grain for others; nor pretend that the empty space then existing in his warehouse would be needed by appellant in the prosecution of his other business of buying, selling, and shipping grain. The record is silent as to relator's ulterior purposes in seeking storage for his wheat at appellant's elevator. Whether the storage was sought with a view to shipping the grain by rail to a market at some point within or without the state is not disclosed; nor can the court ascertain, from the record or otherwise, whether it was relator's purpose to hold the wheat in said elevator for sale at a favorable moment in the local or foreign market; or whether he intended the grain for his individual use, as seed or otherwise, and expected to demand and receive a redelivery of the grain to himself at said grain elevator, as, under § 7 of of said chapter 126, relator would have an option to do, *i. e.,* an option to demand a redelivery of the " kind, quality, and quantity of grain " placed in said elevator.

The foregoing explanations will suffice to develop the fact that the only question we are to determine in this case is one of legislative power, with reference to the limitations of such power existing in the constitutions of the state and nation, and hereinbefore referred to. The legislature, by § 4 of the statute, has declared that "all buildings, elevators, or warehouses in this state erected and operated, or which may be hereafter erected or operated, * * * for the purpose of buying, selling, storing, shipping, or handling grain for profit, are hereby declared public warehouses." Other sections of the statute inaugurate a system of state surveillance over such public warehouses and "public warehousemen," and among other regulations is that particularly involved here, viz., that which fixes a maximum schedule of rates or charges for the storage of grain in said

public warehouses for the different periods of time designated in the enactment. *Vide* § 11, *supra*. The issues presented demand the consideration of questions of capital importance, not only to the industrial and property interests within the state, but other questions even more grave and serious than those of property—questions which have to do with the fundamental rights of individuals, to life, liberty, and the pursuit of happiness, as such rights stand related to legislative power when acting within its proper constitutional sphere.

Before stating our conclusions upon the particular facts of the case under consideration, we invite attention to the proposition of fact now familiar to the profession, that as a result of memorable forensic struggles and repeated judicial affirmations by courts of the highest rank in this country, both state and federal, the right of legislative regulation and control over the business carried on in grain elevators and warehouses, to the extent of prescribing their maximum rates of compensation, has become firmly established, and must now be regarded by the courts as beyond the realm of debate. Whatever the principles may be upon which such legislation is sustained, it is undeniable that it has been repeatedly sustained by the ablest courts this country. True it is that dissenting opinions of marked ability have been affixed to the majority opinions in the cases where the doctrine has been enunciated, but the writer knows of no judicial authority denying the existence of the doctrine of legislative control. The doctrine was first broadly asserted in recent times in a noted case decided by the supreme court of the state of Illinois. Munn v. People, 69 Ill. 80. The case arose under a statute which in all essential features is the same as that under consideration. The statute was enacted to give force and practical effect to an amendment (§ 1, art. 13) of the state constitution, which reads as follows: "All elevators or storehouses where grain or other property is stored for compensation, whether the property stored be kept separated or not, are declared to be public warehouses." This amendment was adopted in 1870, and in 1871 the legislature of Illinois divided public warehouses into three classes, prescribed the taking of a license and the giving of a bond, and fixed a

maximum charge for warehouses belonging to class A for storing and handling grain, including the cost of receiving and delivering, and prescribed a fine on conviction for taking rates in excess of that fixed in the statute, and for not giving a bond or obtaining the required license. Munn and Scott possessed no corporate franchises, but as private persons were managers of a warehouse and elevator located at Chicago. They were convicted and fined for not taking out the license, not giving the bond, and for charging rates for storage and handling grain higher than the rates established by the act. The statute divided warehouses into classes and declared that it should be the duty of every warehouseman belonging to class A to receive into his warehouse any grain that might be tendered to him for that purpose. In short, the statutory regulations of the warehouses belonging to class A in Illinois were not materially different from the statutory regulations prescribed in chapter 126 of the Session Laws of 1891, and which are intended to apply to all warehouses and grain elevators within this state which come within the statutory definition of a "public warehouse." The validity of the statute having been sustained by the supreme court of the state of Illinois, the case was removed by writ of error to the supreme court of the United States, and the contention there was that the statute was repugnant to the third clause of § 8 of article 1 of the federal constitution, and to the fifth and fourteenth amendment thereof. The tribunal of last resort in Munn v. Illinois, 94 U. S. 113, affirmed the decision of the court below, and fully sustained the constitutionality of the Illinois statute, two justices publishing their dissent. We refer to the two decisions of the Munn Case already cited for a more complete statement than can here be given of the particular facts upon which Munn was prosecuted under the statute of Illinois.

Turning, now, to the history of a case well known to the profession, and arising in the state of New York, we find that a penal statute similar to that of Illinois, above cited, was approved by the governor of New York on June 9, 1888. It is entitled "An act to regulate the fees and charges for elevating, trimming, receiving, weighing and discharging grain by means

of floating and stationary elevators and warehouses in this state." The following is the act: "Section 1. The maximum charge for elevating, receiving, weighing, and discharging grain by means of floating and stationary elevators and warehouses in this state shall not exceed the following rates, namely: For elevating, receiving, weighing, discharging grain, five-eighths of one cent a bushel. In the process of handling grain by means of floating and stationary elevators, the lake vessels or propellers, the ocean vessels or steamships, and canal boats shall only be required to pay the actual cost of trimming or shoveling to the leg of the elevator where unloading and trimming cargo when unloading. Sec. 2. Any person or persons violating the provisions of this act shall, upon conviction thereof, be adjudged guilty of a misdemeanor, and be punished by a fine of not less than two hundred and fifty dollars and costs thereof. Sec. 3. Any person injured by a violation of the provisions of this act may sue for and recover any damages he may sustain against any person or persons violating said provisions. Sec. 4. This act shall not apply to any village, town, or city having less than one hundred and thirty thousand population. Sec. 5. This act shall take effect immediately." One Budd, who was engaged in the elevator business at Buffalo, N. Y., was indicted for violating the provisions of said statute, and was charged, in substance, with exacting a greater sum for elevator charges in unloading a cargo of grain and corn than the maximum compensation fixed by the statute. He was convicted, and received a sentence imposing both fine and imprisonment. The case was removed to the court of appeals of New York, which affirmed the judgment of the superior court of Buffalo. People v. Budd, 117 N. Y. 1, 22 N. E. Rep. 670, 682. The Budd Case, with two others arising in different parts of the state of New York, but under the same statute, were, by writ of error, removed to the supreme court of the United States. All three of the cases have been decided by the supreme court of the United States, and an exhaustive opinion was handed down quite recently, and since the case at bar was submitted for our determination. Budd v. People and the two other cases are reported in 12 Sup. Ct. Rep. 468. The tribunal of last resort, after citing numerous

cases decided in state and federal courts upholding the doctrine of legislative control over elevators and warehouses as a proper exercise of the internal police power inherent in every government, reaches the conclusion, and so decides, that the conviction of Budd and the defendants in the other cases must be sustained. This decision reaffirms and accentuates the broad doctrine of the right of state legislative control over warehouses and elevators which was announced October, 1876, sixteen years before, by the same court in Munn v. Illinois, 94 U. S. 113. After referring at length to the opinion of the learned court of appeals (People v. Budd, 117 N. Y. 1, 22 N. E. Rep. 670, 682), which seemed to cover every phase of the question, the federal supreme court declares: "We regard these views which we have referred to as announced by the court of appeals of New York, so far as they support the validity of the statute in question, as sound and just." Proceeding, the court say: "This court in Munn v. Illinois, the opinion being delivered by Chief Justice WAITE, there being a published dissent by two justices, considered carefully the question of the repugnancy of the Illinois statute to the fourteenth amendment. It said that, under the powers of government inherent in every sovereignty, the government regulates the conduct of its citizens one towards another, and the manner in which each shall use his own property, when such regulations become necessary for the public good, and that in their exercise it has been customary in England from time immemorial, and in this country from its first colonization, to regulate ferries, common carriers, hackmen, bakers, millers, wharfingers, innkeepers, etc., and in so doing to fix a maximum of charge to be made for services rendered, accommodations furnished, and articles sold. It was added, 'To this day statutes are to be found in many of the states upon some or all of these subjects;' and we think it has never yet been successfully contended that such legislation came within any of the constitutional prohibitions against interference with private property. It announced as its conclusion that, down to the time of the adoption of the fourteenth amendment, it was not supposed that statutes regulating the use, or even the price of the use, of private property necessarily deprived an owner of his property

without due process of law; that, when private property is devoted to a public use, it was subject to public regulation; that Munn and Scott, in conducting the business of their warehouse, pursued a public employment, and exercised a sort of public office, in the same sense as did a common carrier, miller, ferryman, innkeeper, wharfinger, baker, cartman, or hackneying coachman; that they stood in the very gateway of commerce, and took toll from all who passed; that their business tended 'to a common charge,' and had become a thing of public interest and use; that the toll on the grain was a common charge, and that, according to Lord Chief Justice HALE, every warehouseman 'ought to be under a public regulation, viz., that he take but reasonable toll;' that there was no attempt to compel the owners of the warehouses to grant the public an interest in their property, but to declare their obligations, if they used it in that particular manner; that it mattered not that Munn and Scott had built their warehouses and established their business before the regulations complained of were adopted; that, the property being clothed with a public interest, what was reasonable compensation for its use was not a judicial, but a legislative, question.    The final conclusion of the court was that the act of Illinois was not repugnant to the constitution of the United States, and the judgment was affirmed." The court quoted extracts from the cases cited below, showing conclusively that the precedent made in Munn v. Illinois had been firmly adhered to, and its doctrines frequently applied, by the supreme court of the United States in later cases:   Sinking Fund Cases, 99 U. S. 700, 747; Water Works v. Schottler, 110 U. S. 347, 354, 4 Sup. Ct. Rep. 48; Wabash, St. L. & P. Ry. Co. v. People, 118 U. S. 557, 569, 7 Sup. Ct. Rep. 4; Dow v. Beidelman, 125 U. S. 680, 686, 8 Sup. Ct. Rep. 1028; Railroad Co. v. Minnesota, 134 U. S. 418, 461, 10 Sup. Ct. Rep. 462. To show that the doctrine of Munn v. People had frequently been applied by the state courts, the following cases are cited by the supreme court of the United States in its late opinion:   Lake Shore, etc., Ry. Co. v. Cincinnati, S. & C. Ry. Co., 30 Ohio St. 604; State v. Gas Co., 34 Ohio St. 572; Ruggles v. People, 91 Ill. 256; Davis v. State, 68 Ala. 58; Baker v. State, 54 Wis. 368, 12 N. W. Rep.

12; Nash v. Page, 80 Ky. 539; Girard Point Storage Co. v. Southwarck Foundry Co., 105 Pa. St. 248; Sawyer v. Davis, 136 Mass. 239; Brechbill v. Randall, 102 Ind. 528, 1 N. E. Rep. 362; Webster Telephone Case, 17 Neb. 126, 22 N. W. Rep. 237; Stone v. Railroad Co., 62 Miss. 607; Hockett v. State, 105 Ind. 250, 5 N. E. Rep. 178; Chesapeake & P. Tel. Co. v. Baltimore & O. Tel. Co., 66 Md. 399, 7 Atl. Rep. 809; Delaware, etc., R. Co., v. Central S. Y. Co., 45 N. J. Eq. 50, 17 Atl. Rep. 146; Zanesville v. Gaslight Co., 47 Ohio St. 1, 23 N. E. Rep. 55. The opinion further declares: "We are of the opinion that the act of the legislature of New York is not contrary to the fourteenth amendment to the constitution of the United States, and does not deprive the citizen of his property without due process of law; that the act, in fixing the maximum charges which it specifies, is not unconstitutional, nor is it so in limiting the charge for shoveling to the actual cost thereof; and that it is a proper exercise of the police power of the state." The court further say: "On the testimony in the case before us, the business of elevating grain is a business charged with a public interest, and those who carry it on occupy a relation to the community analogous to that of common carriers. The elevator owner in fact retains the grain in his custody for an appreciable period of time, because he receives it into his custody, weighs it, and then discharges it, and his employment is thus analogous to that of a warehouseman. In the actual state of the business the passage of the grain to the city of New York and other places on the seaboard would, without the use of elevators, be practically impossible." In the course of its opinion the court took occasion to refer to the case of Railroad Co. v. Minnesota, 134 U. S. 418, 10 Sup. Ct. Rep. 462, and to say that the opinion of the court in that case did not overrule Munn v. Illinois, as was claimed by Mr. Justice BRADLEY in his dissenting opinion. The court said: "But the opinion of the court did not say so, nor did it refer to Munn v. People, and we are of opinion that the decision in the case in 134 U. S. 418, 10 Sup. Ct. Rep. 462, as will be hereafter shown, is quite distinguishable from the present case." Further on the court, in speaking of the Minnesota case, say: "That was a very differ-

ent case from the one under the statute of New York in question, for in this instance the rate of charges is fixed directly by the legislature. See Spencer v. Merchant, 125 U. S. 345, 8 Sup. Ct. Rep. 921. What was said in the opinion of the court in 134 U. S. 418, 10 Sup. Ct. Rep. 462, had reference only to the case then before the court, and to charges fixed by a commission appointed under an act of the legislature, under a constitution of the state which provided that all corporations, being common carriers, should be bound to carry 'on equal and reasonable terms;' and under a statute which provided 'that all charges made by a common carrier for the transportation of passengers or property should be equal and reasonable.' What was said in the opinion in 134 U. S. 418, 10 Sup. Ct. Rep. 462, as to the question of the reasonableness of the rate of charge being one for judicial investigation, had no reference to a case where the rates are prescribed directly by the legislature. Not only was that the case in the statute of Illinois, in Munn v. People, but the doctrine was laid down by the court in Wabash, St. L. & P. Ry. Co. v. People, 118 U. S. 557, 7 Sup. Ct. Rep. 4, that it was the right of a state to establish limitations upon the power of railroad companies to fix the price at which they would carry passengers and freight, and that the question was of the same character as that involved in fixing the charges to be made by persons engaged in the warehousing business. So, too, in Dow v. Beidelman, 125 U. S. 680, 8 Sup. Ct. Rep. 1028, it was said that it was in the power of the legislature to declare what should be a reasonable compensation for the services of persons exercising a public employment, or to fix a maximum beyond which any charge made would be unreasonable."

The federal supreme court, without deciding whether it would under any circumstances assume to determine whether or not a maximum rate fixed by the legislature of a state was unreasonable, declared, referring to the New York cases, what may be said with equal truth and propriety of the case we are considering, viz.: "The records do not show that the charges fixed are unreasonable." Nor do we feel called upon to anticipate what our conclusions might be in a case where it is made to appear that a rate of compensation prescribed by statute is so inade-

quate that its practical effect would be to deprive the warehouseman of his property without due process of law, or so inadequate as to be non-compensatory in amount. In its recent opinion above cited the supreme court of the United States quoted at length, and with marked approval, the clear and emphatic language employed by the court of appeals of the state of New York in People v. Budd, wherein that learned court repeatedly gave its sanction to the governmental power upon which the warehouse laws of Illinois and New York are based, and upon which such laws can alone be sustained as constitutional laws, viz., the internal police power. While the courts cautiously avoid all attempts to circumscribe this all-pervasive power by definitions descriptive of its entire scope and utmost boundaries, it is also true that the courts of this country recognize the existence of such power as a fact, and as an essential element in all orderly government. In a case properly within the police power of the state, the exercise of that power by the legislature is as vitally important and as essentially constitutional as the exercise of any other governmental power whatsoever. The supreme court of the United States, referring to the views of the court of appeals, say: "The court of appeals said that, in view of the foregoing exceptional circumstances, the business of elevating grain was affected with a public interest, within the language of Lord Chief Justice HALE in his treatise De Partibus Maris (Harg. Law Tracts, 78); that the case fell within the principle which permitted the legislature to regulate the business of common carriers, ferrymen, hackmen, and interest on the use of money; that the underlying principle was that business of certain kinds hold such a peculiar relation to the public interests that there is superinduced upon it the right of public regulation; and that the court rested the power of the legislature to control and regulate elevator charges upon the nature and extent of the business—the existence of a virtual monopoly, the benefit derived from the Erie canal's creating the business and making it possible, the interest to trade and commerce, the relation of the business to the property and welfare of the state, and the practice of legislation in analogous cases, collectively, creating an exceptional case, and justifying legislative regulation."

It therefore appears that in the legislature of the states of Illinois and New York the power exists, under constitutional restrictions substantially the same as those existing in North Dakota, to control the business transacted in elevators and grain warehouses, to the extent, at least, of prescribing the maximum charges for storing and elevating grain. It follows that the same power exists and may be exercised in North Dakota, if like or similar conditions to those found in the other states mentioned exist here. Nor are the same or similar conditions here indispensable to the existence or to the exercise of legislative control over the warehouses and grain elevators of this state. The police power inheres in our state government, and may be put forth by the legislature, within the limitations of the constitution; nor does the exercise of such power at all depend upon whether the police power has been previously asserted in a similar manner, and over the same conditions and subject matter in other states. It may, indeed, become vitally important in the progressive development of our peculiar local industries to assert the legislative authority over departments of business which never before have been subject to legislative control. Should a new exigency arise in North Dakota, the power to meet it by appropriate legislation will be found in our state government as it has been found in other states. But in the case at bar we think no new departure is necessary. In our judgment, this case falls clearly within the reasoning of the two leading warehouse cases arising in the states of Illinois and New York, already cited. While the conditions in the other states differed somewhat in details, we think they were substantially similar to the conditions existing in North Dakota, which led to the enactment of chapter 126 of the Laws of 1891, and we are clear that the principle which has justified the legislation in the other states can be invoked here. The appellant's grain elevator may be taken as fairly representative of the "600 grain elevators, flathouses, and warehouses" which it appears by the answer exist in North Dakota. It stands at a railroad station, adjoining the track, which track leads to a market within and without the state. Its uses are numerous and variant, and all of its uses are closely connected with the principal productive

industry of this state, viz., that of grain raising for shipment to market.   In the shipping seasons an agent of the elevator can always be found in attendance there to receive, weigh, grade, and distribute the grain—principally wheat—in different compartments in the building, according to the grade to which it belongs.   Usually the proprietor of the elevator is himself a buyer of grain as well as a warehouseman, and the station where the elevator is located is practically the only place in the vicinity, or for miles around, where the producer can find either storage or a buyer for his grain.   It is conceived to be important to the seller that this grain should be in hand, and accessible at the railroad station, where it can be disposed of on any day when the market is favorable or when necessity compels a sale.   The elevators and warehouses of the state have grown up as an inseparable adjunct of the farming interests of the state. They reciprocally depend upon and sustain each other.   It is in fact difficult to conceive of a system in which the peculiar grain raising and shipping industry of this state can be successfully carried on independently and without the practical co-operation of the elevators and warehouses located at the stations. These structures are well adapted to the uses for which they are built, and, while it is true that the railroads in the state are required by statute to furnish box cars to those who may desire to ship in carload lots, yet it appears in this case, and it is a fact of common knowledge here that this mode of shipping grain is wholly inadequate as a means of transporting to market the surplus grain produced in this state, where the yield is as large as it frequently has been in years past.   Nor is shipping by carload lots so convenient to small producers, who more frequently than otherwise would be unable to hold a box car at a station long enough to enable them to haul their grain from a distance and fill such car.   The course of business which has gradually grown up at the elevators is for the farmer to deliver his grain at the elevator, and there it is weighed and graded by the agent in charge.   The farmer receives a warehouse receipt, specifying the quantity and grade delivered, and thereafter the farmer never sees his wheat.   It is shipped out from day to day to suit the convenience of the elevator.   The farmer, if he

so elects, can demand a redelivery of the same quantity of grain and of like quality as that specified on his receipt; but the amount of grain so redelivered is so small as to be nonappreciable—the mass of the grain put in the elevators at railroad stations moves out of the country by rail after being placed upon cars by instrumentalities provided by the elevators and adapted to that purpose.

With the existing limited facilities for storing, handling, and shipping grain in this state, it is not an exaggeration to say that it would be impossible to market the larger part of the surplus grain raised in this state, in any year' of an average yield of wheat and other cereals, without the aid of elevators and warehouses now standing at railroad stations, and placed there for the express purpose of receiving, grading, and storing the grain and delivering it upon the cars. In brief, the elevators and warehouses are indispensable auxiliaries of the producers in conveying their grain to market. These explanations, it is hoped, will suffice to show that the business carried on at the warehouses and elevators erected at the railroad stations in North Dakota has a relation to the entire public which is unique. Not only are these structures peculiarly related to the producers of the grain who deal with them directly, but they have an exceptional relation also to that larger public, whose vital interests are inseperable from those of the producing class. It is true that our warehouses do not possess corporate privileges, and hence cannot be subjected to legislative control as legal monopolies; but they have such a large and decisive work to do in the matter of transferring grain from the hands of the producer to the common carrier and to the buyer that their business has a relation to the public which is peculiar to them, and which lifts such business out of the common business pursuits of our people, and places it in a separate class. We adopt and approve the language of the court in Ruggles v. People, 91 Ill. 256: "The legislature of this state has the power, under the constitution, to fix a maximum rate of charges by individuals as common carriers, warehousemen, or others exercising a calling or business public in its character, or in which the public have an interest to be protected against extortion or oppression."

We deem it superfluous to cite additional authority in support of our conclusions. We are not unaware of the fact that the right of legislative control of any kind of business is liable to abuse. But it is equally a matter of common observation, and one abundantly verified by history as well as by current events, that the untrammeled right of individuals or corporations to make their own charges for services which are indispensable to the public is likewise liable to abuse. There are many checks and safeguards which surround the property and the liberties of the citizen which will operate powerfully to prevent anything like a wholesale assumption of paternal authority over the citizen or over his business pursuits. Before any business can be severed from the mass of private occupations, and be made subject to legislative regulation, there must first be a popular demand for such control, crystalizing into law; and when a statute is enacted which assumes control the citizen has a right of appeal to the courts, and the courts have authority to annul as unconstitutional any statute which erroneously assumes to declare a business to be impressed with a public character when in fact it is only a private pursuit. The court of appeals of New York well said (People v. Budd, 22 N. E. Rep. 680) "that no serious invasion of constitutional guaranties by the legislature could withstand for a long time the searching influence of public opinion, which was sure to come sooner or later to the side of law, order, and justice, however it might have been swayed for a time by passion or prejudice, or whatever abberations might have marked its course." Without further amplification, we unhesitatingly declare, and so hold, that the warehouse and elevator business, as conducted in this state, is a "business peculiarly affected with a public interest," and as such is subject to legislative regulation to the extent of fixing a maximum rate of charges for storing and handling grain in the public warehouses.

One further consideration may be mentioned. If the court entertained doubt of the constitutionality of chapter 126 of the Laws of 1891 much more serious than we do in fact entertain, we should yet deem it to be our duty to give the statute the benefit of such doubts. This course is in accord with an

established rule of statutory construction. State v. Fraser, 1 N. D. 425. Besides, by overruling constitutional objections urged against the statute, the case will be in a position to be reviewed by the supreme court of the United States; while, on the other hand, should we declare against the validity of the statute, no such review could be had. The whole people will cheerfully acquiesce in the conclusions reached by the court of *dernier ressort*, and we are glad to be able conscientiously to so determine the case as to facilitate its review in that court. We have limited our inquiries and conclusions to the one matter of the right of legislative control of public warehouses and elevators to the extent of prescribing maximum charges, and have not considered possible questions which, under other averments of fact, might arise touching the validity and binding force of the rules and regulations prescribed by the commissioners for the government of the public warehouses of the state. We think no such question can legitimately arise under the pleadings, and no such question is presented in the briefs of counsel. The order sustaining the demurrer to appellant's answer, and directing the peremptory writ of *mandamus* to issue, is affirmed. It will be so ordered.

BARTHOLOMEW, J., concurs.

CORLISS, C. J., (*concurring specially.*) I agree to the judgment in this case with reluctance. I am of opinion that the doctrine of the Munn and Budd Cases is unsound. I admit that all authority is in favor of the opinion in this case, but I have an abiding conviction that the dissenting opinions in the Munn and Budd Cases embody the true conception of American liberty. While it is true, as an abstract proposition, that the state courts may give to that liberty a wider scope than the federal courts give to it, yet the question is so national in its character that it occurs to me that there should be only one rule for the whole nation. That rule, of course, must be for the present, and while those cases stand, the rule that the nation's highest tribunal enunciated in the Munn Case, and which it has very recently affirmed in the Budd Case in the most emphatic manner, although by a bare majority. Liberty should

not be one thing under the federal constitution, and an entirely different thing under a state constitution, containing the same guaranties, couched in the same language, and written in the same spirit.  The mind cannot conceive of a question more purely national in its character than the extent of that liberty which is the birthright of every citizen in every state and territory in the land.  It is one of the fundamental rights; not one thing in one state or section and something different in another state or section, but an all pervading principle, interwoven with the very structure of our polity, state and national.  The nation was builded that all of its citizens might enjoy a distinctively American liberty.  To the nation's tribunal the people committed the preservation of that liberty against state encroachment by the fourteenth amendment.  By this very act the people lifted the question from one of state control into the broader field of national control.  In its essential nature it was national before, although prior to that time each state might by its own constitution have settled for itself the boundaries of that liberty.  Not so now.  The right to trace those boundaries is now lodged with the federal supreme court.  The question of liberty being national in its character, the spirit of the fourteenth amendment is that the nation's court shall determine the scope of that liberty, that it may be the same throughout the nation.  The mere want of power in the federal supreme court to compel the state courts to give the citizen no greater liberty than the former court accords him affords no reason why such courts should refuse to follow the line of less extended liberty drawn by the federal court.  While there is great difference between the facts of the case and the facts in the Munn and Budd Cases, it may be that this difference is not of such a nature as to distinguish this case from those in principle.  My associates are clear on this point.  I confess that I have doubts about it.  My views, however, cannot affect the decision, and the federal supreme court must ultimately determine this question.  Whatever I think about it will be of no weight before that court, which must settle for itself the limits of the doctrine it has enuniciated.  If that doctrine is to be much extended, I greatly fear that our boast of liberty will be

found "full of sound and fury, signifying nothing." I could add nothing to what has been said in the dissenting opinions in those cases, with such power of reasoning. Nor do I regard this as the court in which to express a dissent as to the doctrine. Such dissents are proper in that court which ought to declare the rule on this subject for the whole nation, in all its courts, state and national. No question of the reasonableness of the statutory compensation is involved. The issue is purely one of power. No other point is before us on this record. Yielding my individual judgment to higher authority to which I feel it my duty to submit, I agree to the affirmance of the judgment.