## STATE v. ROGERS & ROGERS.[1]

### May 27, 1921.

### No. 22,179.

**Food Control Act.**

1. By the Food Control Act (40 St. 276, 41 St. 297), Congress, acting under the war power of the Constitution, authorized the taking control and regulation of the business of public stock-yards including the business of commission men buying and selling live stock there.

**Warehouse Commission not authorized to fix commissions at public stock-yards.**

2. Under such authority the government assumed control of the public stock-yards at South St. Paul and of the business of commission men doing business there, and during such control the state could not interfere by fixing and enforcing commission charges through the delegated authority of the Railroad and Warehouse Commission pursuant to Laws 1919 (Ex. Sess.) c. 39.

**Act constitutional.**

3. The business of commission men buying and selling stock at public stock-yards is so affected with a public interest that the state may fix

[1] Reported in 182 N. W. 1005.

reasonable commission charges, and Laws 1919 (Ex. Sess. c. 39), giving the Railroad and Warehouse Commission authority to fix reasonable commission charges, is constitutional.

From an order of the Railroad and Warehouse Commission fixing the commissions to be charged by any live stock commission merchant at any public stock yard for the buying and selling of live stock, Rogers & Rogers appealed to the district court for Dakota county. The matter was heard by Converse, J., who vacated the order of the commission. From an order denying its motion for a new trial, the state appealed. Affimed.

*Clifford L. Hilton*, Attorney General, and *Henry C. Flannery*, Assistant Attorney General, for appellant.

*Moore, Oppenheimer & Peterson*, for respondents.

DIBELL, J.

The defendants, commission men doing business at the South St. Paul stock-yards, appealed to the district court of Dakota county from an order of the Railroad and Warehouse Commission of date January 5, 1920, establishing, pursuant to the provisions of Laws 1919 (Ex. Sess. p. 58, c. 39), a schedule of charges for live stock commission men at public stock-yards. The district court vacated the order. The state appeals.

The questions, roughly stated, are whether Congress by the Food Control Act authorized control of public stock-yard facilities and activities including the business and charges of commission men; whether, if it did, such governmental control was taken of the stock-yards at South St. Paul and the business of commission men as to preclude the exercise of state authority under Laws 1919 (Ex. Sess. p. 58, c. 39), authorizing the Railroad and Warehouse Commission to fix commission charges; and whether, congressional action aside, the business at the stock-yards, so far as concerns the business of commission men, is of such a character that the state may regulate commission charges.

1. It was the purpose of the Food Control Act of August 10, 1917 (40 St. c. 53, p. 276), amended by the act of October 22, 1919 (41 St. c. 80, p. 297), sometimes referred to as the Lever Act, "to assure an ade-

quate supply and equitable distribution, and to facilitate the movement of foods, feeds," and many other articles specially enumerated having to do with the production of foods and feeds and fuel and in general designated in the act as "necessaries," to the end that the army and navy might be properly supplied and the war successfully prosecuted. It is the contention of the state that authority to deal with foods and feeds did not include authority to control live stock operations at terminal markets. We cannot agree with this contention. We give no narrow construction to the grant of power. Congress, acting under the war power of the Constitution, was mobilizing the resources of the nation in men and property and potential production with the purpose of rendering effective aid in the war into which it had lately entered, and it had in mind the encouragement of production and the conservation and effective distribution and economic use of food products essential to the carrying on of the war. With a like purpose Congress assumed control of the grain business, fixed the prices of grains, assumed charge of coal and metal production, took over the transportation business of the country, interstate and intrastate, and assumed control or regulation of various industrial operations not in times of peace considered at all public in character. It had as much in mind the control of dealings in live stock at terminal points as the control of finished food products or the control of grain prices and grain markets.

2. We need not enlarge upon the details of the control taken under the Lever Act. The record shows. What was done was in exercise of the war power, not in pursuance of the commerce clause. See Northern Pac. Ry. Co. v. North Dakota, 250 U. S. 135, 39 Sup. Ct. 502, 63 L. ed. 897; Dakota Central Tel. Co. v. South Dakota, 250 U. S. 163, 39 Sup. Ct. 507, 63 L. ed. 910, 4 L.R.A. 1623. The government assumed control of the stock-yards at South St. Paul along with other terminal stock-yards the country over. A representative was put there. He had an office force. The stock-yards and commission men acceded to the arrangement and co-operated as they ought. Licenses were required of commission men and by their terms they were revocable. Investigations were made. The commission men were required to make reports of prior business and of current business. Their books were examined. Regulations were made. The government did not change the current commis-

sion rates. It took care of individual cases and complaints as they arose. The government was active, not alone at South St. Paul, but at other live stock markets the country over. It is enough to say that its control was effective and complete and an accomplished fact. Effective control permitted no divided authority. Northern Pac. Ry. Co. v. North Dakota, 250 U. S. 135, 39 Sup. Ct. 502, 63 L. ed. 897; Dakota Central Tel. Co. v. South Dakota, 250 U. S. 163, 39 Sup. Ct. 507, 63 L. ed. 910, 4 L.R.A. 1623. In the situation presented it was not for the state to fix and enforce commission rates during the period of government control which was rightly exclusive. The order establishing rates was invalid and was rightly vacated.

It may be noted that since the facts in this case arose the government has relinquished control of the South St. Paul yards and other yards.

3. The defendants attack the constitutional validity of Laws 1919 (Ex. Sess. p. 58, c. 39). If this act is unconstitutional the defendants should prevail, regardless of the other questions discussed.

The act provides for the licensing by the Railroad and Warehouse Commission of all commission merchants, brokers, etc., engaged in handling consignments of live stock at public stock-yards and the fixing of reasonable commission charges. Prior to this it had defined public stock-yards, placed them under control of the Railroad and Warehouse Commission, and provided for the fixing of reasonable charges. Laws 1919, p. 554, c. 461.

Munn v. Illinois, 94 U. S. 113, 24 L. ed. 77, is the leading case upon the authority of a state under its police power to regulate charges for facilities furnished and services rendered in certain lines of business affected with a public interest. There the court had under consideration maximum charges for the handling and storage of grain in public elevators at Chicago fixed under legislative authority. In discussing the basis of the constitutional regulation of charges the court said [p. 126]: "Property does become clothed with a public interest when used in a manner to make it of public consequence, and affect the community at large. When, therefore, one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest

in that use, and must submit to be controlled by the public for the common good, to the extent of the interest he has thus created."

Holdings similar to the holding in the Munn Case, and in some respects more comprehensive, were made in Budd v. New York, 143 U. S 517, 12 Sup. Ct. 468, affirming 117 N. Y. 1, 22 N. E. 670, 682, 5 L.R.A. 559, 15 Am. St. 460, and in Brass v. North Dakota, 153 U. S. 391, 14 Sup. Ct. 857, 38 L. ed. 757, affirming 2 N. D. 482, 52 N. W. 408. These cases established the proposition that the business regulated need not be monopolistic in effect nor one upon which special privileges were conferred by law.

In Cotting v. Kansas City Stock-yards Co. 82 Fed. 850, it was held that the state might fix the charges of a stock-yards company. This case was reversed in Cotting v. Kansas City Stock-yards Co. 183 U. S. 79, 22 Sup. Ct. 30, 46 L. ed. 92, upon a point aside from that just noted. And in referring to the question of control the court said: "Tested by the rule laid down in Munn v. Illinois, it may be conceded that the state has the power to make reasonable regulation of the charges for services rendered by the stock-yards company. Its stock-yards are situated in one of the gateways of commerce, and so located that they furnish important facilities to all seeking transportation of cattle. While not a common carrier, nor engaged in any distinctively public employment, it is doing a work in which the public has an interest, and, therefore, must be considered as subject to governmental regulation."

The propriety of the regulation of the grain trade and of the business of commission men engaged therein, is declared by statute and recognized by the courts of this state. The state may require the owner of a country elevator to take out a license. State v. W. W. Cargill Co. 77 Minn. 223, 79 N. W. 962, affirmed in 180 U. S. 452, 21 Sup. Ct. 423, 45 L. ed. 619. So it may require a commission merchant to take out a license and execute a bond. State v. Wagener, 77 Minn. 483, 80 N. W. 633, 778, 1134, 46 L.R.A. 442, 77 Am. St. 681; Farmers Co-op. Elev. Co. v. Enge, 122 Minn. 316, 142 N. W. 328, 126 Minn. 485, 148 N. W. 465. He may be required to render a true statement to his consignor. State v. Edwards, 94 Minn. 225, 102 N. W. 697, 69 L.R.A. 667. Because of the public interest involved a weighmaster's certificate may be

made evidence of weight. Vega Steamship Co. v. Consolidated Elev. Co. 75 Minn. 308, 77 N. W. 973, 43 L.R.A. 843, 74 Am. St. 484.

In Rippe v. Becker, 56 Minn. 100, 57 N. W. 331, Justice Mitchell said: "The right of the state, in the exercise of its police power, to regulate the business of receiving, weighing, inspecting, and storing grain for others, in elevators or warehouses, as being a business affected with a public interest, is now settled beyond all controversy. This power extends even to fixing the charges for such services."

In German Alliance Ins. Co. v. Lewis, 233 U. S. 389, 34 Sup. Ct. 612, 58 L. ed. 1011, L.R.A. 1915C, 1189, where the right of the state to regulate insurance rates was upheld, the court declined to limit the legislative power of regulation to cases where the right to demand and receive service existed in the public, or to cases where a special privilege was conferred by the public, and [p. 411], quoting the language of People v. Budd, 117 N. Y. 1, 22 N. E. 670, 682, 5 L.R.A. 559, 15 Am. St. 460, to the effect that "the underlying principle is that business of certain kinds holds such a peculiar relation to the public interests that there is superinduced upon it the right of public regulation," and commenting upon various other cases, said: "They demonstrate that a business, by circumstances and its nature, may rise from private to be of public concern and be subject, in consequence, to governmental regulation."

Public stock-yards are essential to effective commerce in live stock. There buyer and seller meet. It has come about that commission men do the buying and selling. The business of a stock-yards company and the business of commission men are interrelated and interdependent. A stock-yards business is necessarily localized. There commission men congregate and have their exchanges. It can be effectively operated only at transportation centers. The country over they are not numerous. The great public stock-yards of the country, as has been remarked of grain elevators, stand in the gateways of commerce. They must be used by the public. It is only in a legal sense that it can be said that the public may deal with them or not, as it chooses. Practically there is no alternative. In this sense they are necessarily monopolistic. They are like the instrumentalities of the grain trade at terminal points. Buyers and sellers are necessarily dependent upon them. Their business is public in the sense that elevators at terminal points are public. The

producing public is necessarily dependent upon them for an outlet for their livestock products, and the stock buying public is dependent upon them as a source of supply. The business is so affected with a public interest that the legislature may provide for its control and regulation and for the fixing of reasonable commission charges. The question of the power to regulate is a judicial one. The question of policy in its exercise is legislative. If the charges fixed are unreasonable or confiscation results the parties affected look to the courts.

Order affirmed.