## STATE EX. REL. DAKOTA TRUST COMPANY v. STUTSMAN et al.

(139 N. W. 83.)

**Prohibition to board of railroad commissioners — appeal — moot question.**

1. Where prohibition proceedings are brought to restrain the board of railroad commissioners, created by the statute of this state, from acting in alleged usurpation of powers in questioning the sufficiency of bonds given by the grain elevators under § 2247, Rev. Codes 1905, for the protection of the patrons of such warehouses, and from inquiring into the settlements made by the surety or bonding company with the creditors of an insolvent warehouse, and such bonds have expired by lapse of time before the appeal is heard, such appeal will not be ignored as a moot question, the matter being one of public interest and the real matter in controversy being the authority and power of said commission.

**Board of railroad commissioners — investigation of complaints against grain elevators — power to compel attendance of witnesses.**

2. Under § 2247, Rev. Codes 1905, which requires operators of grain elevators

Note.—The writ of prohibition is the subject of an extensive note in 111 Am. St. Rep. 929.

to file with the board of railroad commissioners a bond running to the state with good and sufficient sureties to be approved by such commissioners and conditioned for the faithful performance of their duties as public warehousemen, and under § 2242, Rev. Codes 1905, as amended by chapter 230 of the Laws of 1909, and which, among other things, gives to the board of railroad commissioners the power "to investigate all complaints of fraud or oppression in the grain trade of this state and correct the same," such board may examine into the sufficiency of such bonds, both as to the form and the general business, conduct, and reliability of the sureties, and for such purpose may summon any witnesses before them that they. please. Whether they can, in such cases, by court procedure or otherwise, compel the attendance of such witnesses and require testimony under oath is a matter not here determined.

### Jurisdiction of board of railroad commissioners — over sureties on bond of elevator company.

3. In passing upon the sufficiency of bonds furnished by the elevator companies, or the necessity of requiring new bonds, the jurisdiction of the board is over the elevator companies rather than over the bonding companies or sureties. It has therefore no right in case of a controversy between the ticket holders of an insolvent elevator company and a surety or bonding company, to summon the said bonding company before it and threaten to cancel its bonds unless it so appears and makes satisfactory settlement with the said ticket holders. It may not seek by such means to force a settlement. It may, however, inquire into the transaction for the purpose of satisfying itself as to the business reliability of said bonding company, and if dissatisfied with the good faith or business methods of said surety, require other bonds to be given by the elevator companies.

### Mandamus or prohibition to board of railroad commissioners.

4. While passing upon such bonds and performing such duties, such board is acting in a quasi judicial capacity, and cannot be controlled in the exercise of its discretion by mandamus or prohibition.

### Board of railroad commissioners — approval of bonds of surety company.

5. The mere fact that a surety company has been licensed by the insurance commissioners to do business within the state of North Dakota does not authorize such company to compel the approval of its bonds by the board of railroad commissioners if sufficient as to form and amount, if such commissioners are dissatisfied with the business habits or conduct of the surety, or, for any other similar reason, believes the bonds to be insufficient.

### Mandamus — prohibition — who may apply for writ.

6. Mandamus cannot be brought by the surety on a bond to compel the acceptance or continued approval of such instrument. If proper at all the proceeding should be brought by the principal, and not by the surety. The same is true of the writ of prohibition when sought to be obtained to prevent

a board which is vested with the power of approval, from disapproving its
said bonds.

Opinion filed November 23, 1912.

Appeal by defendants from a judgment of the District Court for
Burleigh County, *Winchester, J.,* awarding a writ of prohibition en-
joining them from an alleged abuse of discretion in the matter of bonds
furnished by public warehousemen in support of elevator licenses.
Modified.

Statement by BRUCE, J.   This action was originally brought in the
form of a petition for a writ of prohibition against the board of
railroad commissioners of the state of North Dakota to prohibit them
from exercising what is claimed to be usurped and unwarranted pow-
ers.   The petition alleged, among other things, that the plaintiff was
a corporation duly authorized to carry on the business of a surety
company in the state of North Dakota; that one Samuel Kittler was
from on or about the 17th day of September, 1909, continuously
until on or about the 20th day of December, 1910, engaged in the
business of operating a public grain warehouse at Turtle Lake,
in the county of McLean; that in order to comply with the laws of
said state he had procured the petitioner to execute and deliver to the
board of railroad commissioners a bond which in all things complied
with the laws of this state; that while said Kittler was engaged in con-
ducting said business he issued sundry storage tickets to divers persons;
that on or about the 20th day of December, 1910, he became insolvent;
that thereupon the petitioner bond company, with the utmost diligence
and good faith, sought to ascertain the persons to whom it had become
liable on its bond before mentioned and the amount of its liability to
such persons; and that upon obtaining such information it immediately
set about to adjust its liability, and "promptly paid to each of said
claimants the amount or sum of money which each of said claimants
agreed to accept in satisfaction of his or her claim, save two claims,
both of which are still in dispute; and that it stands ready at all times,
and is able and willing, to pay the holders of said unsatisfied claims
whatever amount may be found to be justly due; that in the course of

its investigation it discovered that many of the storage tickets were false, and that said warehousemen had falsely and fraudulently, and with the intent to cheat and defraud said petitioner, misstated the quality of the grain received by him; that by reason of the frauds aforesaid, such petitioner had disputed its liability for the face value of such false and fraudulent storage tickets, and had compromised the respective claims, with the exception of the two before mentioned, for less than their face value; that on or about the 3d day of May, 1911, the defendant board of railroad commissioners, without any authority or jurisdiction, served upon said petitioner a writing and purported order in words and figures as follows, to wit: "In the matter of the claims of holders of storage tickets against Samuel Kittler, of Turtle Lake: The Commission, having investigated the same, finds that all tickets owned by the petitioners are valid, and should be paid in full without discounting or scaling; it is further found that the Dakota Trust Company, the sureties on the elevator bond of the said Samuel Kittler, has, without just cause, compromised many of the claims of said ticket holders at 50 cents on the dollar. It is therefore ordered that the said Dakota Trust Company do and is hereby directed to pay said claims in full to the holders of said storage tickets within thirty days from the date of this notice." That said petitioner ignored and refused to obey said order, and that theretofore and on the 13th day of June said board of railroad commissioners served upon said petitioner a notice or citation and copy of resolution in words and figures as follows, to wit:

In compliance with a resolution adopted by the commission on Saturday the 10th inst., a copy of which I am sending you, I am writing you, giving notice that your company will be required to appear before the commission on Saturday, June 24th, to show cause why all the bonds issued by your company in support of elevator licenses shall not be canceled.

Please acknowledge receipt of this letter and the copy of the resolution and oblige.

(Signed) Respectfully yours,
The Board of Railroad Commissioners.
By Thomas Hall, Secretary.

Attached to this notice, as before stated, was a copy of the following resolution: "In the matter of the failure and neglect of the Dakota Trust Company to comply with a certain order issued by the board of railroad commissioners, requiring them to redeem certain warehouse receipts and to make settlements with the holders thereof; said receipts having been issued by Samuel Kittler, of Turtle Lake, doing business as a public warehouseman and whose license is supported by the bond of the said Dakota Trust Company. Be it resolved, that the secretary be instructed to notify and require the Dakota Trust Company of Fargo to appear before this commission at its office in the city of Bismarck on the 24th day of June, 1911, at 2 o'clock in the afternoon of said day, and show cause, if any there be, why the commission should not cancel the bonds of the said Dakota Trust Company, given in this state, to wit: [Here follows the names of thirty elevator companies.] Because of its failure to effect a settlement satisfactory to this commission with the holders of certain warehouse receipts issued by Samuel Kettler, of Turtle Lake. Be it further resolved: That the secretary notify and require each of the above-named elevator companies or warehousemen to secure and have ready on said date of June 24th, new bonds or undertakings satisfactory to this commission, to take the place of the said Dakota Trust Company's bonds, in the event they are then ordered canceled by this commission. Done at Bismarck, North Dakota, this the Tenth day of June, 1911."

The petition further alleged that such petitioner had in all things complied with the requirements of the law to do business in the state of North Dakota as a surety company, and was, at the present time, surety on the several warehousemen's bonds mentioned in said notice and resolution; that such petitioner had received and was entitled to receive large sums of money as compensation for the assumption of the several risks; that such petitioner was informed and believed that said defendants intended to, and would unless prohibited by the court, assume to exercise the pretended and unwarranted powers which they unlawfully assumed under said notices and resolutions, and would, on the 24th day of June, 1911, assume to cancel said bonds, and require said warehousemen to procure and furnish other sureties, and refuse to accept such petitioner's bonds for said warehousmen or other warehousemen, and thereby deprive such petitioner of a large portion of its

lawful and rightful business, and thus wantonly and unlawfully bring such petitioner into disrepute, to its great and irreparable loss. It further alleged that it had never in any manner consented or agreed to the assumption of such unwarranted power or authority of said defendants to hear, try, and determine the merit or validity of the claims before mentioned, and that the pretended findings of such board were wholly unwarranted and false. The petition then prayed for a writ of prohibition prohibiting said defendants "from further proceedings in the exercise of their usurped and unwarranted powers aforesaid, and commanding them to forthwith cease and refrain from their unlawful acts and conduct aforesaid, and that this court thereupon render judgment that all the acts and proceedings of said defendants in the premises are null and should be held for naught, and for such other and further relief as to the court may seem just." To this petition a return or answer was filed, which admitted the giving of the notices and the passage of the resolution, and a part payment of the claims by the petitioner. It, however, denied that the storage tickets or any of them were falsely and fraudulently issued, and on the contrary claimed that the amount of grain therein receipted for and stated to have been received was of the grade and quality and quantity as alleged, and further stated that at the time of the insolvency of the said Samuel Kittler the said petitioner requested the said board to desist from taking any action to enforce its liability under its bond to the state of North Dakota, or to the holders of the said storage tickets, and that upon the making of such request said petitioner represented that the outstanding claims represented by said storage tickets were to be fully paid and satisfied; that thereafter the said trust company falsely and fraudulently represented "to each and all of the said several ticket holders that said Samuel Kittler, while engaged in his business as a public warehouseman, at the village of Turtle Lake, had engaged in irregular and illegal practices of such character that the said Kittler could be successfully prosecuted criminally for the crime of embezzlement, or some kindred crime, and that the charges for which he could be prosecuted were of such a nature and of such a number that if he were arrested, prosecuted, convicted, and sentenced for each and all of the crimes of which, according to said false and fraudulent representation, he, the said Samuel Kittler, was guilty, he would be sentenced to the

state penitentiary for a term of seventy-seven years; that said relator, by its agents and servants, further represented to the holders of said storage tickets, with intent to deceive and coerce and take unfair advantage of the said ticket holders, that unless each of them should accept 50 per cent of his claim under his storage ticket against the said Samuel Kittler, as payment in full by relator, and a discharge of its liability under its said warehouse bond, that said relator would cause the arrest of the said Kittler for each and all of the said alleged criminal offenses, and would cause his prosecution and conviction; that all of said ticket holders, save two, believing said false and fraudulent representations, so made by this relator, its agents and servants, desiring to protect the said Samuel Kittler against the humiliation and disgrace that would necessarily attend his conviction for said several criminal offenses, accepted 50 per cent of their several claims against relator, and discharged it from further liability therefor." The answer further alleges that the board of railroad commissioners were by law given full supervisory power and control over the ware housemen of the state, and that they had full power and authority to approve, reject, or cancel any and all bonds furnished or submitted by said public warehousemen. It further claimed that, in assuming to conduct the hearing before mentioned, it did not exceed the jurisdiction conferred upon it, and properly and lawfully took cognizance of the complaints of said ticket holders. To this answer a demurrer was interposed, alleging that said return did not "show any defense or any ground or reason for the withholding of the peremptory writ prayed for in the petition," and moving the court for an order directing the issuance of such writ.

On the 10th day of July, 1911, the trial judge entered an order to the effect that "a peremptory writ of prohibition be issued herein as prayed for in the petition, and the plaintiff have and recover its taxable costs and disbursements," and on the 19th day of July, 1911, a judgment was entered to the effect that "it is hereby adjudged and determined that the defendants, commissioners of railroads of the state of North Dakota and board of railroad commissioners of the state of North Dakota, be, and they are perpetually and peremptorily, prohibited and enjoined from in any manner attempting to execute or enforce the orders or resolutions or any part thereof made and adopted

by said defendant board of railroad commissioners on the 10th day of June, 1911, set forth in the petition and alternative writ herein as Exhibit D, same being in substance and to the effect that the relator herein show cause before said defendant board why its bonds or insurance contracts of and for certain public warehousemen should not be canceled in the event of the failure of said relator to comply with the orders and resolutions of said board theretofore made with respect to certain payments, settlements, and obligations of said relator as a surety on the public warehouseman bond of one Samuel Kittler; and said orders and resolutions were and are without the jurisdiction of said defendant board, and null and void; and that a peremptory writ of prohibition shall be issued by this court as prayed for in the petition herein." From this order an appeal was taken. Prior to the argument on the appeal, however, the bonds lapsed and expired. Counsel for the respective parties, however, entered into a stipulation, which, however, was not filed in the trial court or in this court, and which merely appears in the brief of counsel, to the effect that: "Whereas sundry elevator companies and grain warehouses have made application to the board of railroad commissioners for licenses, and have tendered warehouseman's bonds with the Dakota Trust Company as surety; and whereas, there is a difference of opinion between the said Dakota Trust Company and said board with respect to the power and jurisdiction of said board to disapprove, except as to form, a warehouseman's bond upon which a trust or surety corporation duly organized and authorized to make such bond is a surety; and,

"Whereas, it is desirous and important in the public interest that licenses should be issued forthwith to the applicants therefor above mentioned.

"Now therefore, it is hereby agreed between the said board of railroad commissioners and Dakota Trust Company that the board of railroad commissioners may tentatively approve the warehousemens' bonds of the Dakota Trust Company tendered with said application for licenses, and that such approval shall be understood and deemed to be only tentative; and if it shall hereafter be finally determined by the supreme court of the state of North Dakota that said board of railroad commissioners has the power and jurisdiction to disapprove or refuse to accept such authorized trust or surety corporation as a surety on such bonds, then it is agreed that the board of railroad commissioners

may, notwithstanding the tentative approval of the above-mentioned bonds, revoke such approval, and cancel and reject said bonds the same as if said bonds had never been accepted or approved.

"It is further stipulated and agreed that the Dakota Trust Company expressly concedes and admits, and will expressly concede and admit in any proceeding now pending or hereafter commenced to test in court the above-mentioned question of the extent of the board's discretionary power and jurisdiction, with respect to the disapproval of such bonds, that if the board has power or jurisdiction in the first instance to reject, disapprove, or refuse to accept as a surety on such warehouseman bond, a duly authorized trust or surety company which has authority to give such bond, then said board also has like power to withdraw its approval, and cancel and reject such a bond at any time after and notwithstanding such approval of the bond in the first instance; and such revocation of approval or cancelation may be made for the same reasons, and on the same grounds or evidence as would be sufficient reasons, grounds, or evidence to warrant the disapproval of it in the first instance.

"Dated at Grand Forks, North Dakota, this 25th day of October, 1911."

In the briefs of counsel, also, and upon the argument in the supreme court, it was also agreed that the case could proceed as if it were a petition for a writ of mandamus compelling the board of railroad commissioners to approve new bonds to take the place of those which had expired, and it was also conceded that the same rule of law would apply in the case of a mandamus to compel the acceptance of new bonds and a writ of prohibition to restrain the cancelation of those already given.

*Engerud, Holt & Frame,* for respondent.

*Andrew Miller,* Attorney General, and *W. H. Stutsman,* for appellants.

BRUCE, J. (after stating the facts as above). The stipulation entered into by the parties cannot be carried out by this court. The original proceeding was a proceeding for a writ of prohibition. No petition for mandamus was presented to the trial court, and to allow the proceeding to be converted into a proceeding for mandamus in this

court would be for us to assert an original jurisdiction, which the Constitution has not granted to us. As far, too, as the writ of prohibition is concerned, the question is now largely a moot question, the original bonds having expired. The questions involved, however, are of so great public interest, and the real merits of the controversy are still so unsettled, that we can and will consider the questions involved. Boise City Irrig. & Land Co. v. Clark, 65 C. C. A. 399, 131 Fed. 415; Re Morgan, 114 App. Div. 45, 99 N. Y. Supp. 775; Re Kaeppler, 7 N. D. 307, 75 N. W. 253; People ex rel. Spire v. General Committee, 25 App. Div. 339, 49 N. Y. Supp. 725; Coleman v. MacLennan, 78 Kan. 711, 20 L.R.A.(N.S.) 361, 130 Am. St. Rep. 390, 98 Pac. 283. We cannot, however, order the entry of any judgment on the theory of a mandamus proceeding, but on that of a proceeding for a writ of prohibition alone.

In considering this case we must bear in mind that it is presented by demurrer to the return or answer, and that, such being the case, the allegations of the answer must be accepted as true, no matter what the real facts may be, and no matter what merit there might be in the petition if it were considered alone. The arguments and briefs of counsel, however, so confuse the issues raised by mandamus and prohibition that we will discuss this case more or less from the standpoints of both proceedings.

This is not a case where the board of railroad commissioners has refused to approve bonds, and, in refusing to do so, has relied upon its belief that its exercise of discretion need not be accounted for, and that no reason need be given therefor, but a case in which the commissioners have justified their refusal in their answer, and have given reasons therefor. The petitioner trust company contends that the power and duty of the board of railroad commissioners are limited and confined by the language of § 2247 of the Revised Codes of 1905, which requires the warehousemen to file with the board a bond running to the state, "with good and sufficient sureties to be approved by such commissioners in the penal sum of not less than $5,000, nor more than $75,000 in the discretion of the commissioners, conditioned for the faithful performance of their duty as public warehousemen, and compliance with the laws of this state. . . . Such bond . . . shall be in a sufficient amount to protect the holders of outstanding tickets." It con-

tends that this statute makes it the duty of the board to examine and determine the sufficiency of the bond with respect to amount and form alone, and not with respect to the moral or other qualifications of the bondsmen. It further claims that since §§ 4455 and 4456 of the Revised Codes of 1905 permit trust companies to be sole sureties where the law would require two or more personal sureties, and § 4679 of the Revised Codes of 1905 requires certain deposits to be made by such corporations with the state treasurer, and that when the deposits have been made the state treasurer shall so certify, and § 4682, Rev. Codes 1905, provides that the state treasurer's certificate provided for in § 4679 "shall, until revoked, be conclusive evidence of the qualification of such corporation and of its authority to become and be accepted as such surety," and § 4459 of the Revised Codes of 1905 provides that the above-mentioned state treasurer's certificate shall be filed with the insurance commissioner, and that thereupon the insurance commissioner issues his certificate of authority to do business, and §§ 4690 and 4692 provide for supervision and examination of such companies by the insurance commissioner, and § 4464 of the Revised Codes of 1905 provides that such company shall be conclusively presumed to be sufficient surety on any risk within the limit of 10 per cent of their capital; in the case of a surety bond the only duty left for the board of railroad commissioners is to inquire into the form and amount of the bond, and whether or not the surety is authorized to do business, and whether or not the risk is within its limit, and that the financial and moral responsibility of the company within that limit is conclusively presumed. It claims that the board has no right to inquire into the moral character or the past dealings of the surety company, and that that matter is for the insurance commissioner alone, and that until he revokes the license of such company, the company must be conclusively presumed to have a good business character and to be abundantly responsible, and that its bond must be accepted by the board. It further contends that the board is expressly limited by § 2242, as amended by chap. 230, p. 333, Laws of 1909, which grants it the following powers: (a) To supervise the handling, weighing, and storing of grain and seed; (b) to establish rules and regulations (1) for weighing, (2) for management of warehouses; (c) to investigate complaints of fraud and oppression in the grain trade; (d) to correct such frauds or op-

pression so far as may be in their power; (e) to revoke warehouse licenses for cause upon notice and hearing. The board of railroad commissioners, however, contend that § 2247, Rev. Codes, 1905, requires the warehousemen to file with the board a bond running to the state, *"with good and sufficient sureties to be approved* by such commissioners" and that it is their duty to ascertain whether the bond is good and sufficient, and that a good and sufficient bond means a bond which is both given by a surety which is financially responsible and reliable, and which is accustomed to fair dealing, and that such bond must be sufficient to cover all losses. They claim that if the capital of the trust company is limited to $100,000, as it is in this case, they are justified in holding, or, at any rate, have the right to hold, that such surety is by no means sufficient if the company has issued bonds within the state, or to the commission, amounting to many hundreds of thousands of dollars; and that it is for them to inquire into such sufficiency. They also insist that they have the right to inquire into the previous dealings and business methods of the surety. Counsel for the trust company insists that when the board seeks to inquire into the past or the previous transactions of the bondsmen, it is seeking to hear and determine the merits of the bondsmen's controversies with the beneficiaries under previous bonds, and the extent of its liability or the validity of its settlements with them, and in such case is assuming judicial functions which have not been intrusted to it, and which, by § 85 of the Constitution, belong exclusively to the courts. The board of commissioners in answer contend that it is in no way seeking to determine any rights or obligations, or to announce any judgment, but is merely seeking to ascertain whether the bond is good and sufficient or not, and that in such investigation it has the right to inquire into the past transactions of the surety and into their fairness. It also claims that § 2242, as amended by chap. 230, p. 333, of the Laws of 1909, vests in the board the power to investigate the complaints of fraud or oppression in the grain trade, and to correct such frauds or oppression so far as may be in their power; and that, in furtherance of such duties, it is not only their duty, but their power, to see that the bondsmen are reliable, both in financial sufficiency and in business integrity. Counsel for the bond company in reply insists that the approval of the bonds or the investigation of the sufficiency of the surety company or the

business customs of such surety, in no way refer to the *grain trade,* and are matters entirely apart from the same.

The powers which have been by statute conferred upon the board of railroad commissioners of North Dakota are quasi judicial. They belong to that twilight zone which lies between the ministerial or judicial, and the legislative, which it is so difficult to bound and define, but which it is nevertheless so necessary to recognize. Its recognition, indeed, is necessary to all scientific, social, and legal development. Such acts and duties are, it is true, often spoken of as being "ministerial," but this is only for the purpose of distinguishing them from the actions and duties which belong solely to the courts, and which cannot be either delegated by or taken from them. See State ex rel. Gale v. Ueland, 30 Minn. 29, 14 N. W. 58; Wilkins v. State, 113 Ind. 514, 16 N. E. 192; State v. Hathaway, 115 Mo. 36, 21 S. W. 1081. The term "ministerial," indeed, is generic rather than specific, and ministerial acts may be divided into two classes: (1) Those which are ministerial solely, and involve no judgment or discretion; and (2) those which are quasi judicial. To this latter class those now sought to be exercised by the board of railroad commissioners belong. Hartford F. Ins. Co. v. Raymond, 70 Mich. 485, 38 N. W. 474; Ramagnano v. Crook, 85 Ala. 226, 3 So. 845. That such powers may be delegated to such board is now well established. State v. Hathaway, 115 Mo. 36, 21 S. W. 1081; Wilkins v. State, 113 Ind. 514, 16 N. E. 192; Burke v. Collins, 18 S. D. 190, 99 N. W. 1113; Re Hoover (D. C.) 30 Fed. 51.

Even where the duty to be performed is quasi judicial and involves the exercise of discretion on the part of the tribunal or officer, it is well established that mandamus will lie to compel such tribunal to take some action in the premises, and to exercise its judgment or discretion. In such cases, however, the function of the writ is merely to set in motion. It cannot be used to direct how the duty shall be performed or the discretion exercised, as such a use would amount to substituting the judgment or discretion of the court issuing the mandamus for that of the court or officer to whom it was committed by law. See 19 Am. & Eng. Enc. Law, 732 and cases cited: 26 Cyc. 158; High, Extr. Legal Rem. § 24; Broaddus v. Essex County, 99 Va. 370, 38 S. E. 177; American Casualty Ins. & Secur. Co. v. Fyler, 60 Conn. 448, 22 Atl. 494, 25 Am. St. Rep. 337, and notes thereto, and the notes to Dane v.

Derby, 89 Am. Dec. 728, 742; Decatur v. Paulding, 14 Pet. 497, 10 L. ed. 559. It seems, however, to be fairly well established that where it is clear that such judgment or discretion is abused and exercised arbitrarily or in a capricious manner, *as where the discretion is made to turn upon matters which, under the law, should not be considered,* mandamus will lie. (See 26 Cyc. 161 and cases cited; 19 Am. & Eng. Enc. Law, 737). There are, however, many dissenting decisions even upon this proposition, and many courts hold that mandamus will not lie to review such discretion no matter how unjustly or arbitrarily it may have been exercised. Shotwell v. Covington, 69 Miss. 735, 12 So. 260, and cases cited; Ramagnano v. Crook, 85 Ala. 226, 3 So. 845. A distinction, also, is quite generally made between those cases where the board relies, in its answer, upon the general presumption that it has properly exercised its discretion and those in which it seeks to justify its action and gives reasons therefor. The question for us to determine in this case is not whether, if the board had refused to give the reasons for its refusal to approve the bonds, this court would have interferred, but whether the reasons given for the refusal in the return to the writ show an arbitrary caprice and an abuse of discretion. We are inclined to believe that no abuse of discretion has been shown. The board was not, as counsel for the respondent suggests, trying merely a former dispute or seeking to put the appellant on trial for an alleged offense. They went, it is true, a little too far and had no right to attempt to force a settlement of prior claims. They were exercising in the main, however, their discretion merely, and giving reasons therefor. They were seeking both to have the claims of the depositors settled, and to ascertain whether the bonds offered were good and sufficient; and we believe that the inquiry in regard to this matter should involve the question of business custom and integrity as well as of financial responsibility, and that though it was for the insurance commissioner to say whether the trust company should do business within the state and could act as a bondsman at all, it was for the board of railroad commissioners who were intrusted by the statute with the duty of supervising the grain trade and protecting the ticket holders in the elevators, to exercise their discretion as to what bondsmen they should accept, and reject any or all if they either disliked their business methods or thought that they had written more bonds than their capital would warrant. Surely this

24 N. D.—6.

duty would be the duty expected of the directors of any corporation, and it would seem that the same duty and responsibility was placed upon, and should be intrusted to, the board of railroad commissioners. The respondents have, and had, the right to do business in North Dakota. They have no vested right, however, to do any particular kind of business with any particular person. Section 4455, Rev. Codes 1905, indeed, clearly intimates that no such corporation has, even though approved by the insurance commissioner, any inalienable right to do business within the state, but that its bonds must be first *accepted* and *approved* by the officers or boards to whom they are presented. Nor have they, or any other person, or corporation, by virtue of their permission to do business within the state, a vested right to recognition by the railroad commissioners, or by any other state board. That board can exercise its honest discretion, and it is responsible for the same solely to the people who have created it, provided that it does not interfere with any vested rights, which it has not in this case. The duties which under the statute are to be performed by the board while approving bonds are, as we before stated, quasi judicial and discretionary, and would not in any view of the law be subject to review by the writ of mandamus, except on a showing of a clear abuse of discretion. A purely ministerial act, indeed, is one which "a person performs in a given state of facts in a prescribed manner, in obedience to the mandate of legal authority, without regard to or the exercise of his own judgment upon the propriety of the act being done." Flournoy v. Jeffersonville, 17 Ind. 169, 79 Am. Dec. 468. We know that there are cases in which it is held that the mere approving and accepting bail after it has been fixed by competent authority is a ministerial act solely (Ray v. Doughty, 4 Blackf. 115) ; but in these cases the question whether the act could be delegated was considered, rather than the question as to whether it could be compelled. So, too, there is a wide difference between an individual, such as a clerk of a court with no supervisory power and no quasi governmental responsibility, and that of a railroad commission such as the one before us. There is little difference, indeed, between the powers and responsibilities of the railroad commission of North Dakota and those of the board of commissioners in the case of State ex rel. Reynolds v. Tippecanoe County, 45 Ind. 501, and in which the court held that mandamus would not lie to compel the granting of a liquor license

even though the statute prescribed the form of the application, and there was but little, if anything, for the commissioners to decide. Nor is there any material difference between the case at bar and the case of Shotwell v. Covington, 69 Miss. 735, 12 So. 260, where the court held that mandamus would not lie to compel the president of a board of supervisors to approve the bond of the clerk of the court.

A very suggestive case is that of State ex rel. State Pub. Co. v. Smith, 23 Mont. 44, 57 Pac. 449. In this case the statute provided for the letting of state printing contracts by the state board of examiners, of which the governor was a member. The act also provided that all contracts made by the board should be approved by the govern· or and state treasurer. The court held that the duty of such officers to approve a contract let by the board was not solely ministerial, but involved judicial discretion, and could not be controlled by mandamus. "The word 'approve,'" the court in its opinion says, "means 'to pronounce good; think or judge well of; admit the propriety or excellence of; be pleased with; commend.' (Century Dict. title 'Approve.') The Constitution does not define the extent to which they must go in the investigation of the action of the board, nor does it require that they must act together or state any reason for their actions. Yet from the very fact that their approval is indispensable, under the Constitution, the conclusion is irrestistible that their action is designed to be a check upon the action of the board. This is the implication from the terms used and the rule of construction, that every word of the instrument should be rendered operative. . . . If this be true, in the discharge of their duty they must use their judgment and discretion as to all matters into which the board could or should inquire. This includes not only the pecuniary responsibility of the bidder, but his judgment, skill, ability, capacity, and *integrity* as well. . . . The governor having a general knowledge of the affairs of the state, and presumptively being fitted by his superior qualifications to pass judgment upon the action of the board, it was thought proper by the constitutional convention that he should give the taxpayers the benefit of his judgment and discretion. The treasurer being in a position in which he is presumed to be especially informed as to the condition of the state's finances, it was thought proper to require the exercise of his judgment and discretion also; the ultimate purpose was by this system of

counterchecks to secure economy and prevent favoritism. *It is not for us to say whether the provision is a wise one or not.* These officers, acting within the sphere of their constitutional duties, *are accountable under their oaths to the people only,* just as are the individual members of this court, and *it is no part of our duties to inquire into their motives in withholding their approval* from the contract let by the board to the relator. If they have acted arbitrarily, if they have chosen to pervert the functions of their high offices to vile, partisan uses, or to the purposes of favoritism as is suggested by the allegations of the affidavit; we have no power to restore their consciences and to bring them to a sense of duty. The form in which they are to be judged is the minds and consciences of the people, whose servants they are and who alone can hold them responsible for the manner in which they perform their duties." See also Oliver v. Wilson, 8 N. D. 590, 73 Am. St. Rep. 784, 80 N. W. 757; Ramagnano v. Crook, 85 Ala. 226, 3 So. 845; Swan v. Gray, 44 Miss. 393; State ex rel. Eaves v. Rickards, 16 Mont. 145, 28 L.R.A. 298, 50 Am. St. Rep. 476, 40 Pac. 210.

We have examined the statutes relating to the duties of the insurance commissioner and of the board of railroad commissioners with some care, but we cannot agree with counsel for respondent that the duties of the latter board are confined merely to the ministerial act of seeing that the bond is sufficient in form, and that the action of the insurance commissioner, in admitting the companies to do business within the state, is conclusive as to their financial responsibility and business integrity, so that the railroad commissioners, and, on the same reasoning, every other state officer and board, will be compelled to accept them as bondsmen, no matter what their dealings in the past may have been, or no matter how much in excess of their capital stock and of their deposit with the state their obligations may be.

We believe, in short, that the appellants' contentions as to the power and prerogative of the board are in the main correct, but, as we have before stated, no mandamus proceeding is technically before us.

When we come to consider the question from the standpoint of a petition for a writ of prohibition, we must take as established the above propositions as to the general power of the board in approving and canceling bonds, but we are constrained to hold that in the case at bar it exceeded its powers. We believe that the board of railroad com-

missioners had no power to attempt to force the surety company to make a settlement with its creditors, nor to assume to itself the power of adjudicating what the amounts of those settlements should be. We believe, however, that the commissioners had the right, if they thought the bonds furnished by the elevators were insufficient for any reason, whether on account of the financial responsibility of the bondsmen or their lack of business reliability, to require new ones.

We also believe that under § 2247, Rev. Codes 1905, which requires operators of grain elevators to file with the board of railroad commissioners a bond running to the state, with good and sufficient sureties, to be approved by the commissioners and conditioned for the faithful performance of their duties as public warehousemen, and under § 2242, Rev. Codes 1905, as amended by chapter 230, Laws of 1909, and which, among other things, gives to the board of railroad commissioners the power "to investigate all complaints of fraud or oppression in the grain trade of this state and correct the same," such board could examine into the sufficiency of the bonds, both as to form and general business conduct and reliability of the sureties, and for such purpose might summon any witnesses before them, and make any reasonable investigations that they pleased. Whether they could, in such a case, by court procedure or otherwise, compel the attendance of such witnesses and require testimony under oath, is a matter not here determined. A surety or bonding company can, at any rate, hardly complain because, when complaints are made of its business dealings, and objection made to its further retention as a bondsman, it is given an opportunity to appear and to be heard.

It may be, in a clear case of fraud or collusion, that the bonding company would, in a proper proceeding, have some measure of relief, and that the courts would be willing to protect its rights under the contracts already entered into. A clear distinction, however, must be made between the bonding company and the elevator companies. The bonds were required by the statute to be furnished by the elevator owners, and not by the bonding company. The bonding company was a surety only. The elevator companies were required to furnish the bonds, and it was for them to make their own contracts. The board of railroad commissioners has, under the statute (§§ 2241 and 2247, Rev. Codes 1905) the power to require good and sufficient bonds, and

to pass upon the sufficiency of the bonds furnished to them by the elevator companies, no matter by what sureties signed, and, as a necessary incident to such power, to demand new and additional bonds if they become dissatisfied with those already given. We believe that they have these powers not only under the clause of the statute which imposes upon them the duty of approving the bonds, but also under the clause which gives them the power to prevent fraud in the grain trade. We certainly believe that under the latter clause they have the power to investigate all such matters. They may not, it is true, be able to compel the bonding companies to appear before them, but they have the right to make the inquiries. The dealings of the board are with, and their jurisdiction is over, the elevator companies, rather than over the bonding company. No one, we believe, would contend that a surety on an appeal bond or bail bond would have reason or right to object if a clerk of a court or a judge were to refuse to accept a bond on which he was a surety. The controversy would be between the appellant or offerer of the bond and the clerk, and not between the clerk and the surety. We believe that the board had no power to compel the appearance of the bondsman before it for the purpose of forcing a settlement with its creditors before a legal adjudication of its liability. It certainly had no power to threaten to cancel the bonds if it did not appear or settle with the ticket holders, on the basis that it, the commission, thought just. It had the power, however, to make reasonable injuries to satisfy itself as to the sufficiency of the bonds furnished by the company, and fair play would require the giving of an opportunity to the trust company to explain its past dealings. The power of the commission extended at the most to insisting that the elevator companies should furnish new and additional bonds, and if such companies should refuse so to do, to revoke their licenses. We believe they had the power to investigate into the business methods as well as the financial responsibility of the surety, and that their reason for seeking to cancel the bonds which is given in the answer is a reason that the courts cannot declare to be without merit. Of course, if the petition is true, another aspect is put upon the case; but we must remember that it is the answer or return that we are considering, and that all of the allegations of the answer are admitted by the demurrer. The answer, in short, charges the surety company not only with bad faith, but with

seeking to compound numerous felonies. We can hardly say that such charges, if sustained, against the surety, would not justify the requirement of new bonds. We do not say that the surety company is guilty of the felonies charged. We merely say that the answer so charges, and that the truth of the answer is admitted by the demurrer.

We resolve the main and real question in controversy in favor of the appellants, and hold that the board of railroad commissioners has the power and authority to examine into the sufficiency of bonds issued by the elevator companies, as to form, as to amount, and as to the general reliability and business methods and previous good faith of the bondsmen. In the exercise of their legitimate discretion in these matters, they cannot be controlled by mandamus, prohibition, or any other proceeding; nor can they be compelled to accept and approve as sureties persons or corporations of whom they disapprove. For good faith in such matters they are responsible to the public, and not to the sureties.

Such being our conclusion, it follows that the judgment of the district court should be modified. That judgment was as follows: "Is is hereby adjudged and determined that the defendants, commissioners of railroads of the state of North Dakota and the board of railroad commissioners of the state of North Dakota, be, and they are, perpetually and peremptorily prohibited and enjoined from in any manner attempting to execute or enforce the orders or resolutions, or any part thereof, made and adopted by said defendant board of railroad commissioners on the 10th day of June, 1911, set forth in the petition and alternative writ herein as Exhibit D, the same being in substance and to the effect that the relator herein show cause before said defendant board why its bonds or insurance contracts of and for certain public warehousemen should not be canceled in the event of the failure of said relator to comply with the orders and resolutions of said board theretofore made with respect to certain payments, settlements, and obligations of said relator as surety on the public warehouseman bond of one Samuel Kittler; and said orders and resolutions were and are without the jurisdiction of said defendant board, and null and void; and that a peremptory writ of prohibition shall be issued by this court as prayed for in the petition herein." The resolutions of the board spoken of as Exhibit D in such judgment contain two

parts. The first was an order and resolution directing that the Dakota Trust Company appear before said board and show cause why the commission should not cancel the bonds of said trust company because of its failure to effect a settlement satisfactory to the commission with the holders of the warehouse receipts issued by said Samuel Kittler. This part of Exhibit D was beyond the power of the commission. In other words, the commission had no power to direct, or by threats or otherwise to force, a settlement between the trust company and the creditors of Samuel Kittler. The commission, on the other hand, had a perfect right, if they saw fit, and on account of their dissatisfaction with the business methods of the surety, to require the elevators to furnish new bonds, and the trial court should not have enjoined the board from carrying out that part of the order or resolution which was as follows: "Be it further resolved that the secretary notify and require each of the above-named elevator companies and warehousemen to secure and have ready on said date of June 24th new bonds or undertakings, satisfactory to this commission, to take the place of the said Dakota Trust Company's bonds, in the event they are then ordered canceled by this commission." The words, "ordered canceled," are, perhaps, unfortunate; and the words used should have been "in the event that new bonds are required by this commission." The substance of the resolution, however, was beyond criticism, and its real meaning is quite evident.

The cause, therefore, will be remanded to the district court with directions to enter an order prohibiting the board of railroad commissioners from ordering the Dakota Trust Company to appear before it, and show cause why the commission should not cancel the bonds of said trust company because of its failure to effect a settlement satisfactory to the commission with the holders of the warehouse receipts issued by said Samuel Kittler. Such order or judgment, however, is to contain no other provision or prohibition.

No costs or disbursements will be allowed to either party.

BURKE, J., concurs.

SPAULDING, Ch. J., concurring. I concur fully in the construction of the law announced in the opinion of Judge Bruce herein. While

doing so, I think it proper to add a few words in support of the conclusions. No department of our state government is more intimately related to the people and to their security in dealing with corporations than is the board of railroad commissioners. The Constitution of the state creates this board, but leaves it to the legislative assembly to prescribe their duties. That body in its wisdom has seen fit to impose upon such board, supervision of the grain trade. The legislative details regarding such supervision need not be further entered into. The services of the board of railroad commissioners in such connection, when honestly and intelligently rendered, are of inestimable benefit to the public, and furnish it much needed protection. Their duties relating to the supervision of the grain trade correspond in that line largely to the duties of the public examiner to supervise the conduct of the business of state banks, and the object of supervision of the two lines of business is much the same, yet in some respects the need of supervision over the grain trade is far greater than the necessity for supervision over banks. Under existing conditions in this state practically all farmers, and many other residents of the state, are compelled to have dealings some time during the year with public elevators, and a very large part of the income of the farmers of the entire state comes from public elevator companies or proprietors in exchange for grain deposited in or sold to such elevators. The small grain raisers especially are at the mercy of such companies or proprietors, and are entitled to protection of the state against fraud or irresponsibility on the part of the people to whom they must dispose of their grain. The amount handled in this manner undoubtedly aggregates, on the average, something like a hundred million dollars per year, and some years considerably in excess of that figure.

The legislative assembly has, wisely, in my opinion, made some provision for this much needed protection. Having in view the magnitude of the business, its vital relationship to the welfare of the state, the law intended to make provision for such protection should be given a liberal construction to the end that its purpose may not be defeated, and if its meaning is ambiguous it should be given such construction as will best permit the ends sought to be accomplished, and furnish most nearly the protection needed.

The order and judgment of the district court in this case went con-

siderably beyond its proper scope, and prohibited the board from exercising jurisdiction in matters which to me seem clearly within its powers. This furnishes, however, no reason for setting aside the judgment in so far as it prohibited the attempted excess of jurisdiction on the part of the board, which I think is limited to the cancelation of the bonds in question; and if it was intended to adjudicate upon the rights of the ticket holders in the Kittler elevator as against the bonding company, this was beyond the jurisdiction of the board, at least until the claims of such ticket holders should be established by a judgment of a court of competent jurisdiction. In fact, as it seems to me, the claims of the parties against the bonding company would first have to be established in a court of law. This is in accordance with the terms of the bond given, which, in this respect, is conditioned that the surety "shall pay all sums for which he shall be adjudged to be liable by any of the courts of the state of North Dakota by reason of the laws of said state or the rules or regulations of said board."

The learned trial court, however, did not limit the relief granted the surety company within the proper limits. It not only enjoined the board from attempting to enforce payment of the claims against the Kittler elevator and the surety company, and from canceling the bonds given by the surety company, but it even prohibited the board from citing before it the different elevator companies to show cause why they should not furnish additional bonds, and in fact from taking any steps in the premises.

Regarding the propriety of this court adjudicating upon the right or power of the commissioners to approve or disapprove bonds executed by surety companies authorized to do business in the state and offered by elevator proprietors, I apprehend that the law differs materially from the law applicable to the cancelation of bonds, and that the discretion which may be exercised by the board in rejecting or disapproving bonds is much broader than that possessed by it over the subject of cancelation of bonds previously approved. I, however, see no reason why the parties to a proceeding may not, for purposes of their own, waive the right to have their cause determined upon one phase of the law and submit it on another, whether the two may harmonize or not. The respondent in this case has, by express stipulation, in effect waived its right to stand upon the law applicable to

the cancelation of bonds, and consents that this court may determine this controversy upon the law applicable to the power of the board to approve or disapprove bonds. This may justify us in passing upon the power of the board in this respect, but it does not seem to me that it would justify a reversal of so much of the judgment of the district court as was proper when the case was there submitted, and before such waiver by stipulation was made, as is claimed by appellant. This appeal was submitted and argued by both parties, more with reference to the power of approval and disapproval, than on the power to cancel bonds; and we are passing upon the contentions of the parties as presented, and which were so presented for reasons which they thought furnished sufficient grounds for such argument and presentation, all involving the powers and duties of the board of railroad commissioners in relation to surety bonds offered by proprietors of public elevators.

Goss, J. (concurring in part and dissenting in part). The facts recited in the majority opinion are very much abbreviated, and in the conclusions therefrom laid down as the law of the case the writer can agree only as to part of the judgment ordered, believing that the judgment must be in all things unconditionally affirmed. Accordingly, the writer's understanding of the facts and conclusions of law applicable under all the contentions of respective counsel are set forth.

This proceeding arises on a petition and supporting affidavit for writ of prohibition asked by the petitioner, a trust company duly organized and existing as such under the laws of this state, against the board of commissioners of railroads of the state, seeking to prohibit action by them commenced for the avowed purpose of canceling the surety bonds filed pursuant to law with the commission and heretofore approved by them of over thirty different elevator companies, including many line elevator companies of this state, as principals on said warehousemen bonds with petitioner company as surety. Under the law, such bonds are exacted in amounts not less than $5,000, nor more than $75,000, for each elevator company to insure the redemption of warehousemen receipts, grain tickets, issued to the public dealing with such warehousemen. The bonds run to the state, with the board of railroad commissioners as the body whose approval must

be had, and with which said bonds are filed and deposited for the benefit of the public.

In the year 1910, one Kittler, operating an elevator, became insolvent, leaving outstanding claims in the form of unredeemed grain tickets or warehousemen receipts for grain received at his elevator. This petitioner was surety for Kittler in the sum of $5,000, with surety bond approved by and on file with the board. On notification by the board the surety company requested the board to permit it to investigate Kittler's liabilities in such respect, and it did so, with the result, as it alleges, of finding fraudulent grain receipts in circulation issued by Kittler with the collusion of the persons dealing with his elevator and therein depositing grain for sale or storage. Thereupon the surety company effected a compromise with all ticket holders and creditors of Kittler to whom they were responsible, excepting two ticket holders. In compromising they paid 50 cents on the dollar in release of themselves as surety and Kittler as principal for said obligations. The remaining two ticket holders with whom settlement has not been effected are litigating with the surety company the question of fraud and collusion between themselves and Kittler and the validity of said warehouse receipts, in which litigation liability has not been determined by judgment. Some time thereafter, the board discovering that the surety company was not making payments in full to Kittler's creditors, but shaving the claims at 50 cents on the dollar, ordered the company to make payment in full to all ticket holders, including the two with which the litigation is in progress. This notice and order of the board was ignored, petitioner refusing to comply therewith, evidently considering it none of the business of the board as to how much was paid in compromise of the claims, or how the claims were settled, so long as they were settled with the creditors. The board thereupon investigated, and *ex parte* determined that the surety company was acting dishonestly and fraudulently in compromising with the various ticket holders, and assert that the surety company secured compromises and settlements under the threat of prosecution of Kittler, the elevator man, for embezzlement, in case it had to pay in settlement more than 50 cents on the dollar; and that the various creditors, out of consideration to Kittler, rather than cause him to be prosecuted, accepted one half in full payment of their claims. No action has ever been taken on the

bond of Kittler against the surety company, so far as appears from the record. Asserting that the petitioner as a bonding company acted dishonestly and fraudulently in the settlement of the claims with Kittler's creditors, and as a basis for action by it, the board by order cited petitioner to appear before it and show cause why, because of its course of dealing in such respect, all the warehousemen and elevator bonds for the many lines of elevators for which it was surety in this state should not forthwith be canceled; which order, if put into effect, would result in debarring this petitioner from the furnishing of surety bonds for elevator companies in this state. The order was directed against the surety company alone. The various elevator companies for which as principals it was surety were not cited nor proceeded against. More than a million dollars' worth of elevator bonds are thus sought to be canceled.

The obligations of the bond in the Kittler matter, and of all bonds involved, after reciting the reasons for their execution, read as follows: "Now, therefore, if the said Samuel Kittler shall faithfully and lawfully perform his duties as public warehouseman, and comply with all the laws of the state of North Dakota relative thereto, and the rules and regulations adopted by the board of commissioners of said state in connection therewith, and shall pay all sums for which he shall be adjudged to be liable by any of the courts of the state of North Dakota, by reason of the laws of said state or the rules or regulations of said board, then this obligation to become null and void, otherwise to remain in full force and effect." The first action taken by the board was by order served upon petitioner and reading: "In the matter of the claim of the holders of storage tickets against Samuel Kittler, of Turtle Lake: The commission having investigated the same, finds that all tickets owned by the petitioners are valid, and should be paid in full without discontinuing or scaling." "It is further found that the Dakota Trust Company, the surety on the elevator bond of said Samuel Kittler, has without just cause compromised many of the claims of said ticket holders at 50 cents on the dollar. It is therefore ordered that the said Dakota Trust Company do and is hereby directed to pay said claims in full to the holders of said storage tickets within thirty days from the date of this notice, May 3, 1911." This was the order, the ignoring of which brought down upon the head of

petitioner the following order, "To show cause, if any there be, why the commission should not cancel the bonds of said Dakota Trust Company given in this state, to wit:"—then follows an enumeration of the various elevator companies, in all over thirty; after which the reason for such action is designated as "because of its (petitioner's) failure to effect a settlement satisfactory to this commission with the holders of certain warehouse receipts issued by Samuel Kittler, of Turtle Lake. . . . And be is resolved that the secretary notify and require each of the above-named elevator companies or warehousemen to secure and have ready on said date new bonds or undertakings satisfactory to this commission, to take the place of said Dakota Trust Company's bonds, in the event they are then ordered canceled by this commission." Before the return day of said order, an alternative writ of prohibition was issued out of the district court. This writ was issued upon the petition reciting the foregoing matters and the history of the Kittler transactions, the good faith of the petitioner in all transactions in connection therewith, the alleged false and fraudulent action of Kittler in collusion with the holders of storage tickets, in that tickets were fraudulently issued in excess of the value of grain deposited with or sold to it and the knowledge thereof of the ticket holders, and its settlement in full of all claims excepting two, in litigation as hereinbefore set forth; the action of the board in excess of its jurisdiction and power and its resulting damage in property and business to the petitioner, and that no speedy and adequate remedy, except by writ of prohibition, exists to petitioner. Accompanying said petition is a copy of the bond in the Kittler matter and the resolutions and notices of the board served upon it, including the foregoing recited orders of the board.

To the alternative writ of prohibition, the petition and affidavits reciting the foregoing matters, the board made return in substance re-averring the foregoing, except that they deny that the discounting of tickets was made in good faith, and allege the same was done with intent to cheat and defraud the holders of storage tickets in the Kittler matter, and done under coercion occasioned by threats of petitioner and its agents to prosecute Kittler criminally if the offered compromises were not accepted; and that, because of said coercion and to avoid criminal prosecution of Kittler, said compromises were made at 50 cents on the dollar of actual liability of the surety and principal

to the holders of the tickets. "Defendants further allege that as the board of railroad commissioners of the state of North Dakota they are by law given full supervisory power and control over the public warehousemen of the state, and that they have full power and authority to approve, reject, or cancel any or all bonds submitted or furnished by said public warehousemen. That in assuming to conduct the hearing upon the right of relator to further continue as a surety upon the several bonds named in Exhibit "D" (the list of thirty-two elevator companies whose bonds with relator as surety are sought to be canceled) attached to relator's petition, by reason of the oppressive methods by it employed in forcing the holders of the storage tickets issued by said Samuel Kittler to make settlement, defendants did not exceed the jurisdiction conferred upon them as the board of railroad commissioners of the state of North Dakota by law, and properly and lawfully took cognizance of the complaints of said ticket holders against the unlawful and oppressive methods employed by relator in effecting said settlement and securing its discharge," and allege that the facts set forth in relator's petition are insufficient in law to warrant the granting of said writ. To this return plaintiff "demurs upon the ground that the allegations of said return do not show any defense or any ground or reason for the withholding of the peremptory writ prayed for in the petition; and the plaintiff now moves the court for an order directing the issuance of the peremptory writ of prohibition as prayed for in plaintiff's petition;" which was granted and the peremptory writ of prohibition issued accordingly. Respondents appeal from the order and judgment entered thereon. The judgment was entered on July 19, 1911, by the clerk of the district court, and the appeal taken by the board on January 17, 1912. Some three months after the entry of the judgment appealed from, and on October 25, 1911, the board of railroad commissioners, by its president and the attorneys for the petitioner and respondent herein, entered into a stipulation. Appellants have briefed under the assumption that this stipulation changes the nature of the issues involved, and transforms the prohibition proceedings in the lower court into a mandamus proceeding and issue in this court. This stipulation is as set forth in full in the majority opinion.

To arrive at a foundation from which to proceed, we brush aside this stipulation as so much *débris*. This action is before this court as an

appeal from the granting of a peremptory writ of prohibition. As the action was cast in the court of original jurisdiction, so must the action remain in this court for the exercise of appellate jurisdiction in that action. To hold otherwise would be to here assume original jurisdiction in matters other than as authorized by the Constitution. Appellants are here on appeal from the judgment rendered below and in that prohibition proceeding, and the case cannot be regarded, notwithstanding the stipulation, as a mandamus proceeding. The same form of proceeding is before us, carrying the same issues for determination and review on appeal as were before the trial court; and counsel cannot, by stipulation, materially alter either the form of action or the issues tried below. The stipulation was not settled as a part of the record on appeal, and it could not have been, as it was no part of the trial record, but is a matter subsequent to judgment appealed from. Whatever may be the subsequent act of the commission under said stipulation, it must be something separate and apart from the judgment to be awarded in this case. As such it may be the subject-matter of another action, but with that we have no concern. It may be true, as we learn from the stipulation and reasons therefor in the briefs, that the particular bonds sought to be canceled and against which this writ of prohibition appealed from is leveled, have expired and new bonds have taken their place, executed by the same principals and surety, but that does not change the subject-matter before us, nor render the case moot. As we view it, it is not those particular bonds that constituted the subject-matter of this action, but instead, any bonds given by this surety for said elevators that may be canceled by this board. In other words, if the board had the right to cancel those bonds they have the right to cancel the succeeding bonds now existing in lieu of the former, and executed for the same purposes, and under the same law requiring them. Besides, a public question is involved, and that alone, under the authorities, in the discretion of the court, may be considered and taken as sufficient to warrant determination where the judgment of the court will operate upon the subject-matter and its decision be other than the determination of an academic question. The same issue is alive and before us in all of its phases now as was presented to and was before the trial court, and the judgment of this court will operate upon the rights and liabilities of

the parties hereto on the bonds involved the same now as on trial below. Accordingly we should determine the issues in this prohibition proceeding in precisely the same manner and on no different issues than those that were before the court of original jurisdiction.

The board of railroad commissioners exists by constitutional authority authorizing it and for the performance of such duties as the legislature may impose upon it. Recognizing the public nature of the grain business as outlined by the common law, branding the business of public warehouseman as that of a public or quasi public nature, the legislature has seen fit, in its control of public agencies and utilities, to place the control of the public warehouseman business of this state in the hands of the board of railroad commissioners, and its right to do so and the right of the legislature and the board to reasonably regulate said business is unquestionable. State ex rel. Stoeser v. Brass, 2 N. D. 482, 52 N. W. 408, 153 U. S. 391, 38 L. ed. 757, 4 Inters. Com. Rep. 670, 14 Sup. Ct. Rep. 857. And it is equally settled that the acts of this board in such particulars, including the approval or cancelation of bonds of warehousemen, though involving discretion, are administrative, and not judicial, in character. We are dealing, then, with judicial review of the administrative acts of an administrative board. In such review the question first arises: Was said board, in the proceedings to cancel these bonds, acting within the scope of the duties conferred upon it by law? As to this we conclude that as to the right to cancel the bonds of public warehousemen in appropriate proceedings for that purpose and upon valid grounds for cancelation they have the right to act. The power to exact security and approve the same by necessary implication carries with it the power to cancel insecure or insufficient surety or bonds. But do the pleadings disclose the right to here act and on the grounds here asserted for such action? And if such action is found to be erroneous and jeopardizing plaintiff's rights, is it subject to review and correction by this proceeding in prohibition? We will first investigate the reasons alleged by the board actuating it in its proceedings taken.

We first observe that the order is a separate and wholly independent matter from that in which arose the provocation, namely, the settlements made by this relator in the small Kittler matter. In that proceeding again we inquire by what right does this board assume to it-

24 N. D.—7.

self the power to, in an *ex parte* matter, investigate, determine, and adjudge the regularity of dealings of a surety for the principal, the warehouseman, with the principal's creditors in the matter of the adjustment by the surety of the principal's obligations to those creditors, and, indirectly, the settlement thereby of the surety's obligations to said creditors? And here we may appropriately state that the relation existing between Kittler and this relator was that of principal and surety, and with Kittler's creditors as the beneficiaries, and with the bond to the state for the protection of the creditors of Kittler. See § 47, Rev. Codes 1905, as amended by chap. 251, Sess. Laws 1911. No pecuniary interest is conferred upon the state by the bond. It runs to the state, because the warehouseman is engaged in a public business, and to that extent stands in somewhat the relation of a public officer to the state; and recognizing this public obligation, the state exacted the bond to protect not it, but Kittler's creditors. It has by law designated as its agent for the approval of the bond the body intrusted with supervision of the warehousemen's business in which Kittler was engaged. And it must be, under the statutory authority granted the board to supervise the grain business and prevent fraud and oppression therein, and correct the fraud and oppression where found (§ 2247, Rev. Codes 1905), that the right exists, if at all, for said board to control the acts of the surety company in settling its bonded obligation with Kittler's creditors and Kittler's obligation as principal to said creditors. Does, then, the statutory authority conferred upon the board to supervise the grain business, and prevent or correct fraud and oppression therein, extend to the right to supervise settlements by a surety of obligations incurred by a principal to third persons while said principal was engaged in the grain business? The answer to this is the determination of whether the surety thereby becomes engaged in the grain business, as by statute this board's authority cannot extend beyond the grain business, either to regulate it as a business or to prevent fraud or oppression therein. On this we must conclude in accord with the facts that the surety company is a bonding company to respond to liability, and is not engaged in the grain business either incidentally or at all. As to this we must take judicial notice of the surety business, of the various statutes exacting surety bonds, among which might be cited § 405, Rev. Codes 1905, requiring surety com-

pany bonds of county treasurers, for instance, on their qualifying for office, and furnished under similar statutes and for the same purposes as are bonds required in this case, as a protection to the public. We know that the public, in exacting such security, does it for the same purposes as does the bank exact bonds of its cashier, against defalcation or embezzlement; namely, as a business precaution. It would be absurd to claim that this bonding company, if it may happen to be on bonds for a score of county treasurers of this state, was in the county treasurer business as a business, or that because it may be found surety for a hundred banking institutions that it is in the banking business; and equally absurd, and to our minds farfetched, is it to claim that, because this company is bondsman for a principal engaged in the warehouseman business, that it is in the business of such principal, and as such subject to the control of the administrative body controlling in a general way the business of the principal. To so assert would furnish precedent for a board of county commissioners to claim the right to control, to a degree, any bonding company who stands surety for county officers; or would likewise confer upon the banking board of this state the right to control, as engaged in the banking business, a surety on a banker's bond. The statement of the proposition exposes the fallacy of such reasoning. We conclude, then, that this petitioner, as Kittler's surety, was not engaged in Kittler's business, and did not therefore come within the purview of the statute authorizing this board to control said bond company, because forsooth it could regulate Kittler's business as a public warehouseman. Instead, we find the law exacting the bond has determined the conditions of the bond. And these conditions are of simple liability to the creditors of Kittler. The surety company has by its bond agreed that it will pay, not any claim that any creditor may assert that Kittler as a warehouseman owes or may be liable for, but that it as a surety company "shall pay all sums for which he (Kittler) shall be adjudged to be liable by any of the courts of this state," by reason of the laws of the state or the rules or regulations of the board promulgated under and in accordance with those laws. So that, according to the very terms of the bond, the liability is not fixed thereunder nor owing until judgment is entered in some court. And no procedure is known whereby judgment can be entered in the name of any person other than the creditor, the ticket

holder or his assignee. Until the liability became such in fact by judgment, no legal duty rested upon this surety company to distribute its money among Kittler's creditors. That it did so in advance of judgment against its principal creditors is a matter not within the cognizance or concern in any way whatsoever of this board. They could as well claim the right under the statute to investigate the government of China, as to do as they did, *viz.,* entertain complaints from Kittler's creditors, after he had become bankrupt and had ceased the grain business, and investigate and determine Kittler's liability to them, and in advance of judgment in court call upon and demand the surety to pay according to their extra-legal *ex parte* findings as to liability. With no authority to investigate, they had no right to make an order, based upon the result of their investigations. In so proceeding they were not acting as an administrative board on matters within the grain trade, but assuming to themselves power over matters determinable only by judicial proceedings. They have assumed to exercise the creditor's right to invoke a determination of liability, seized hold of person and subject-matter without process of law, and, after so doing, exercised judicial functions and tried the matter before themselves; and as a result therefrom pretended to determine the legal rights properly ascertainable only in a court of law after trial between the creditor and his debtor, a principal, and his surety. A mere statement of this proposition brands it as extrajudicial and void, and as wholly beyond the power of any administrative board or officer under our system of government, wherein such judicial power is vested only in the courts.

With no jurisdiction to assert over Kittler, his creditors, or these bondsmen on the disastrous termination of Kittler's venture in the grain business, it follows, as the night the day, that any conclusion or judgment or determination of the board as the result of said void proceedings can constitute in itself, as a finding or determination or result of a proceeding, no defense to this writ brought to restrain its action about to be taken upon such unlawful grounds, unless the writ itself, on other grounds, will not lie.

Under this head the board, *in the briefs, but not in the return to the writ,* asserts the right to cancel these bonds, because as individuals and as a board, from extraneous events happening in the Kittler case, they had become satisfied that this surety company is dishonest. That,

therefore, under their duties devolving upon them as public officers, they could not conscientiously allow the bonds already given to remain in force; and hence, in the exercise of their discretion and in the performance of their duties, they have a right to cancel by the wholesale the bonds on which the petitioner is a surety wherever found in the grain business. The assertion of this is the equivalent of claiming an arbitrary right, the right to act to the injury of others without the necessity of assigning reasons, or upon reasons as here assigned manifestly capricious. As above demonstrated there could probably be no finding of dishonesty in the acts of the company in the settlement with Kittler's creditors, inasmuch as no violation of the bond or the law in letter or spirit by the petitioner is shown. While as a business proposition the payment of claims under such circumstances by a surety company, without investigation to determine if fraudulent or fictitious, might be termed such recklessness and want of care on the part of a surety company as might warrant investigation of said surety company by the state banking board under whose supervision, inspection, and order to a large extent it operates, a board of co-ordinate power and responsibility as a state board in its sphere with that of the board of railroad commissioners in its, it is not necessary to discuss in this connection further than to say that the reasons given by the board upon which their distrust of this petitioner is alleged to be founded must, from the very nature of things, be ignored and treated as insufficient to warrant such conduct by the board if based on such grounds. And as an administrative board whose acts are reviewable by the courts in instances such as this, for it to assert the right to reserve to itself the power of cancelation of bonds, and give no reason therefor, is in effect to deny the right of court review. If this defendant, in reply to the order of court to cease or show cause why it should not cease such action, may assert by return we have acted because of this capricious reason given, which if you hold to be capricious and insufficient we then assert we have acted for reasons known to ourselves, but which we refuse to disclose, can be held to be a return or defense, it is the equivalent of asserting want of power in a court to review at all such matters in any event. This is the equivalent of asserting the right to act arbitrarily as well as capriciously, and above and beyond

judicial control in any event. To this doctrine we cannot subscribe. But now to further analyze these proceedings.

Too much emphasis cannot be given to the fact that this is not a case wherein the board defends or even asserts that it has instituted proceedings by its summary order to show cause because of any inadequacy of the bond or insufficiency in any respect of the bond and bonding company. No question is raised but what the bond is in proper form and given in strict compliance with the statute; nor do the commissioners return or assert; directly or indirectly, that this petitioner as a surety company is not able and sufficient to respond to its bonds if called upon to do so. Nor is there any fraudulent conduct on the part of this bond company asserted, because the very facts shown upon which we are asked to infer that the board may conclude that defendant company is fraudulent in the conduct of its business show absolutely the contrary; and that, instead this board has overstepped and attempted to exercise power without the vestige of jurisdiction so to do, and pursuant thereto has issued its void order directing the surety company to disburse promiscuously its money to persons without shadow of established legal claim thereto, and when the board have no authority whatever in such matter. The void mandate in excess of jurisdiction of this board, served upon this company May 3, 1912, ordered petitioner to pay these claims in full within thirty days. The order was rightfully ignored. Then follows an equally void order, wholly in excess of authority or jurisdiction, to the effect that inasmuch as you have not paid these claims in compliance with the previous void order of this board, show us why we should not cancel every warehouseman bond you have given the state. This is the substance of this lawsuit. Nothing more is involved. No justification for the acts can be made in law. None is attempted. The board themselves are not before us in a case where they are seeking to cancel bonds because of insufficiency of the bondsmen. And grant that previous business dealings may be considered as bearing upon the sufficiency of bondsmen, in order for such dealings to be any justification it must be asserted that, because thereof, they render the bond insufficient or at least unsatisfactory to the board. Such is not here asserted. The bald facts are plead, and on their face they show an utter want of legal justification for the act of the board beyond its jurisdiction. At no

place does the board assert that, because this bond company is surety on a million dollars' worth of bonds to the state, it believes the company has too much contingent liability as surety for it to pass as sufficient. True, the board in its brief attempts to so claim, but without basis under the facts established or its verified return to the writ. In a nutshell the defense in this case is summed up as being that we, the board, have ordered this surety company to pay Kittler's creditors in full, even though said company has settled with said creditors the principal's liability to them, and even though such order of the board is void for want of jurisdiction in the premises; but we, the board, have made that order, and you make those payments within thirty days. Upon your noncompliance we, the board, because of disobedience to that order, ask you to show cause why all the warehouseman bonds you have given the state should not be canceled. That sums up the case of the appellants, and anything in the briefs or otherwise injected into the case is beyond facts and tends to befog the issue. If prohibition does not lie under these circumstances wherein action without semblance of jurisdiction from the beginning is attempted by this board, that remedy never applies to any case. And that it does lie see 2 Spelling on Extr. Relief, § 1716, from which we quote: "The writ of prohibition is that process by which a superior court prevents an inferior court or tribunal from usurping or exercising a jurisdiction with which it has not been vested by law." "The writ of prohibition lies only when the inferior court proposes to exceed its lawful jurisdiction as to the person or the subject-matter, or in the enforcement of its rulings in a manner or by a means not intrusted to its judgment or discretion." Grant that the board may, for insufficiency of bonds, cancel them; that does not devest the petitioner of the remedy sought under these facts, as clearly, in the enforcement of its void order without grounds cognizable in law, is it not, in the words of the authority, engaged "in the enforcement of its rulings in a manner or by a means not intrusted to its judgment or discretion?" Must it not act upon some legal grounds, or by acting in excess of jurisdiction must it not, at least, claim to be acting because of the insufficiency of these bondsmen in order to confer upon it jurisdiction to act at all? And nowhere in the return is there such a claim, but instead, it tacitly admits it is engaged in the enforcement of a void order by means amounting to

nothing but duress; and that it is concerned in nothing but the enforcement of the first void order, that constituting the only reason for its conduct. Again we quote from 32 Cyc. 604: "Although it has been held that the writ will not lie where an inferior tribunal in a cause properly within its jurisdiction purposes to exceed its powers, but only to restrain such a tribunal from usurping jurisdiction; yet the rule supported by the great weight of authority is that the writ will lie in all cases either of abuse or usurpation of jurisdiction by an inferior tribunal." Under this broad rule we may grant every claim made in counsel's brief, and consider the same as amending the return, and still the writ will lie in this case of manifest abuse at least, of jurisdiction, conceding that a jurisdiction existed to issue an order of cancelation of these bonds upon no ground whatever; which, by the way, is conceding much, to say the least. The writ should even then lie, because under the rule in 32 Cyc. 605, "If the inferior tribunal is assuming to act when it has not jurisdiction of the subject-matter of the proceeding, or if it has jurisdiction thereof, but is exceeding its legitimate powers in the particular matter, the writ will lie." In citing these relators to show cause before it why its surety bonds given the state in compliance with statute and accepted by the state under statutory authority should not be canceled, because of its disobedience of an order void because of being beyond the authority or jurisdiction of the board, it is in effect citing relator to show cause why its bonds should not be canceled without cause or reason therefor, and surely under such circumstances, conceding jurisdiction of subject-matter and of persons, it is, in the words of the authority, "exceeding its legitimate powers in the particular matter, and the writ will lie." See also McConiha v. Guthrie, 21 W. Va. 134. But counsel may assert that the board had jurisdiction of the subject-matter and of the persons, and must then have had jurisdiction to determine its authority, jurisdiction to err, and that in so doing, if it errs, it is not a sufficient usurpation of judicial authority to warrant the writ of prohibition. School Dist. v. Burris, 84 Mo. App. 654, at 663, answers this very contention in the words of State ex rel. Dawson v. St. Louis Ct. of Appeals, 99 Mo. 221, 12 S. W. 661, that "it cannot be said that the writ will be issued only in those cases where the lower court has no jurisdiction whatever over the case before it. . . . 'The province of the writ is

not necessarily confined to cases where the subordinate court is absolutely devoid of jurisdiction, but it is also extended to cases where such tribunal, although rightfully entertaining jurisdiction of the subject-matter in controversy, has exceeded its legitimate powers.' High, Extr. Legal Rem. § 781. Especially is this true where there is no remedy by appeal. The remedy by prohibition lies when the matter or cause in which the court is acting does not fall within the classes of which the law gives it jurisdiction, or when it acts in excess of its jurisdiction. . . . The writ of prohibition is applicable whenever jurisdictional functions are assumed which do not rightfully belong to the person or court assuming to exercise those functions. It is the nature of the act which determines the propriety of the writ. The writ is as available to keep a court within the limits of its power in a particular proceeding as it is to prevent the exercise of jurisdiction over a cause not given by law to its consideration." The nature of the act here about to be done by this board determines the propriety of the writ. From it we find that, although the board may have authority to cancel bonds for insufficiency or for other grounds properly cognizable by it, it is here proceeding without cause, without grounds, and hence without right, and there is no appeal or adequate relief from its usurped power when executed. In further illustration of this rule see the recent case of West Virginia C. Gas Co. v. Holt, 66 W. Va. 516, 66 S. E. 717, the holding of which is expressed by the syllabus as follows: "Prohibition lies to prevent the enforcement of an unauthorized judgment for costs rendered by a circuit court, notwithstanding the said circuit court may have jurisdiction to pronounce judgment upon the merits of the action." As in the case before us, the order for cancelation is but the enforcement of a void order made without semblance of jurisdiction. Under this authority the writ must lie. For similar cases, see subject "Prohibition," Century Dig. §§ 37 to 56; and Decen. Dig. § 10. But we have authority from our own state conclusive of this question. See State ex rel. Dorgan v. Fisk, 15 N. D. 219, 107 N. W. 191, wherein a district court was held subject to the writ of prohibition where, by injunction, it wrongfully restrained the operations of a drainage board in proceedings wherein the board had the right to act, and wherein, in the absence of allegations of fraud or other ground of equitable interference, its action was con-

clusive. The application for inj  nction recited none of such grounds
for equitable interference, and this court granted the writ upon. the
.grounds of an excess of jurisdiction on the part of the lower court,
although, concededly as a court of general jurisdiction and upon proper
grounds, it would have had jurisdiction to restrain such proceedings.
Because the grounds upon which the injunction was granted did not
confer jurisdiction of the particular matter in that particular action
upon the district court, although it concededly ordinarily would have
had jurisdiction of the parties by service of its process and by law of
the subject-matter, because as a court of general jurisdiction it had
equitable jurisdiction to issue the injunctional order. Nevertheless,
because of such excess of jurisdiction and the absence of a plain, speedy,
and adequate remedy in the ordinary course of law, the writ of prohi-
bition was granted. The court there shows the distinction between a
lack of jurisdiction from the beginning in the proceedings and an excess
of jurisdiction after jurisdiction in the proceedings had been regularly
acquired.

See also Zinn v. District Ct. 17 N. D. 128, 114 N. W. 475, wherein
the principle announced by the decision is by the syllabus given as
follows: "The writ of prohibition is not a writ of right, but is avail-
able only when the inferior court, body, or tribunal is about to act
without any jurisdiction or in excess of jurisdiction." In the course
of the opinion the court quotes with approval § 1716 of Spelling on
Extr. Legal Rem. heretofore cited.

The foregoing rule is also announced in the following words from 16
Enc. Pl. & Pr. 1095: "It [prohibition] issues to an inferior court
when such court exceeds its jurisdiction in a cause of which it may
take cognizance no less than when it has no jurisdiction whatever."

Appellant has briefed as though this were an action to test the right
of the board to disapprove these bonds, and that such right to approve
was not controllable by mandamus. This is in line with the stipula-
tion which we have disregarded for reasons heretofore explained. This
proceeding is in prohibition to prevent a cancelation of bonds here-
tofore approved. The act of approval, whether it be considered as in-
volving discretion to the extent of being a judicial or quasi judicial
act, or instead be classified as a ministerial act according to the con-
flicting authorities, is something nowise analogous to the cancelation

by arbitrary action without reason, or upon grounds manifestly capricious of bonds theretofore approved, and under such approval presumed sufficient in fact. Nor de we determine the question of whether the board may disapprove as insufficient a warehouseman's bond given by a surety company of this state. This question is in no wise involved, as the return, as heretofore stated, does not raise any question whatever concerning the sufficiency of the petitioner surety company.

As to the propriety of this particular writ, no point is made that certiorari, instead of prohibition, should have been invoked; and the rule that certiorari is allowable only after final judgment would answer such a contention. See Spelling, Extr. Legal Rem. § 1894. By the time cancelation of bonds would in form be effected and a foundation laid for the execution of new bonds of these principals, any relief otherwise available by certiorari would be inadequate, because too late and as after the resulting changed status of the parties, and the right to a writ of prohibition would then be jeopardized by the completion of the act that should have been stayed. So, if this be treated as a proceeding to cancel the bonds, the writ should issue, or if it be treated instead as an extrajudicial proceeding to compel compliance with a previous wrongful and void order made without jurisdiction, it should then issue. Whether the proceedings sought to be prevented are wholly without the jurisdiction of the commissioners from the beginning as to subject-matter and person, or whether it be assumed that the board, on proper grounds, may so act and is here acting on subject-matter within its jurisdiction, but without grounds upon which to assume jurisdiction of such subject-matter and of the parties, it is equally true that then likewise the writ should issue.

One further matter requires consideration. Has the petitioner the right to maintain this action? It is brought by this surety for many principals, without those principals before the court, for whose acts it stands sponsor in these proceedings. But the rights as between the surety and principals are not in litigation. The issue here is as to the power of appellant board to deny petitioner its right to be surety on warehousemen's bonds. In asserting such power, the commission asserts the right to deprive petitioner of the premiums coming to it from its satisfied principals, its property accruing to it under its contracts with principals as its customers. Perchance the principals may

not care, and may everyone consent, under stress of circumstances and the coercion of this board with supervisory power over them, that every bond in question may be canceled. That but illustrates that as to the relief sought the principals are not necessary parties, and the want of necessity of action through them. Every right of petitioner here involved is determinable in this action between it and the board. And petitioner alone is the real party in interest. Under the issues as here framed, there then exists no reason on that score why petitioner should be denied justice. The main opinion suggests that petitioner stands in a position similar to a surety on an undertaking to keep the peace, or to a surety on the bond of a defendant in a criminal prosecution, and that, as in those instances petitioner would not be heard to assert a property interest, he should not here be heard so to claim. It is pretty hard to imagine any property interest arising out of a criminal prosecution. Such is as distant from it as is the nature of the obligation at bar different from such a bond as well as the object to be accomplished in such proceedings. There is no similarity. In the case before us, where surety bonds are required, possibly amounting to millions, to be furnished by someone to principals for a premium or consideration to be paid therefor by the principal, with bonding companies whose incorporation is provided for by statute for the very purpose, we do not go far afield to see a benefit or property resulting to the bonding company. Not that it has any vested right as against the state, but that it has the right to be protected as an artificial person in the enjoyment of whatever rights it may have as against capricious and unwarranted, and therefore wrongful, acts of a state board, resulting to its detriment. To this extent it has the same right as has any person, and the fact that an administrative board as an agent of the state seeks wrongfully and without ground to expel it from transacting business within the state, to which it is equally entitled with every other person, is sufficient grounds for it to seek the courts for protection in its rights and property and to guarantee it the right to be heard.

The board have acted in good faith in all their proceedings, but that does not alter the fact that they have assumed to exercise powers they do not possess. Consequently this action is maintainable by this petitioner; that the action of the board is reviewable when manifestly in

excess of its jurisdiction as in this case, and hence its action being arbitrary and capricious and to petitioner's damage, and petitioner being the real party in interest, the peremptory writ of prohibition should issue in the suit of the petitioner as prayed for, and the judgment of the lower court should be, in all things, unqualifiedly affirmed.

Justice FISK concurs fully in the foregoing opinion.